David B. **BERGERON; Mark L. Erlich; Anthony J. Graziano; Thomas Harrington; Simon James; Kirk Fordyce; Lawrence Morrisroe; David Wallace; David Woodman; William J. Sullivan; Stephan A. Adamic; George Bidgood; Theodore H. Brodie; Donald Colavecchio; Thomas J. Gunning; Michael Shaughnessy; and Christopher Topps on behalf of themselves and all other similarly situated Trustees of health care funds, Plaintiffs,**

v.

**PHILIP MORRIS, INCORPORATED; Philip Morris Companies, Inc.; R.J. Reynolds Tobacco Company; RJR Nabisco, Inc.; Brown & Williamson Tobacco Corporation; British American Tobacco Co., Ltd.; BATUS Holdings Inc.; B.A.T. Industries P.L.C.; Lorillard Tobacco Company; Lorillard Corporation; Loews Corporation; The American Tobacco Company; American Brands, Inc.; Liggett Group Inc.; Liggett & Myers, Inc.; The Brooke Group, Limited; Hill & Knowlton, Inc.; The Council for Tobacco Research–U.S.A., Inc.; and The Tobacco Institute, Inc., Defendants.**

No. 99 CV 6142.

United States District Court,
E.D. New York.

June 8, 2000.

dus, Connerton & Ray, Washington, DC, for plaintiffs.

Barbara Robbins, Steven M. Barna, Peter C. Hein, Wachtell, Lipton, Rosen & Katz, New York City, Steven C. Bennett, Jones, Day, Reavis & Pogue, New York City, Paul F. Stecker, Phillips, Lytle, Hitchcock, Blaine & Huber, L.L.P., Buffalo, NY, for defendants Philip Morris, Inc. & Philip Morris Companies.

Steven C. Bennett, Jones, Day, Reavis & Pogue, New York City, for defendant R.J. Reynolds Tobacco Co.

Marjorie Press Lindblom, Kirland & Ellis, New York City, for defendants R.J.R. Nabisco, Inc., BATUS Holdings Inc., American Tobacco Co. and American Brands, Inc.

Garyowen P. Morrisroe, David A. Wallace, Chadbourne & Parke, L.L.P., New York City, for defendant British American Tobacco, Co.

Joseph M. McLaughlin, Simpson, Thacher & Bartlett, New York City, for defendant B.A.T. Industries, PLC.

Gary Long, Shook, Hardy & Bacon, L.L.P., Kansas City, MO, Alan Mansfield, Greenberg Traurig, New York City, for defendants Lorillard Tobacco Co., Lorillard Corp. and Loews Corp.

Aaron H. Marks, Kasowitz, Benson, Torres & Friedman, LLP., New York City, for defendants Liggett Group, Inc., Liggett & Myers, Inc, and Brook Group, Limited.

Bruce M. Ginsberg, Davis & Gilbert, New York City, for defendant Hill & Knowlton, Inc.

Harry Zirlin, Debevoise & Plimpton, New York City, for defendant Council for Tobacco Research–USA, Inc.

Melvyn I. Weiss, Michael C. Spencer, Beth A. Kaswan, Milberg Weiss Bershad Hynes & Lerach LLP, New York City, Robert J. Connerton, John McN. Broad-

Anthony R. Mansfield, Charles M. Miller, Seward & Kissel, New York City, for defendant Tobacco Institute, Inc.

*MEMORANDUM and ORDER*

WEINSTEIN, Senior District Judge.

TABLE OF CONTENTS

I   INTRODUCTION ................................................166

II  FACTUAL ALLEGATIONS .......................................166

III STANDARD FOR DISMISSAL ...................................168

IV  CHOICE OF LAW .............................................169
    A.  Principles.............................................169
    B.  Application ..........................................170
    C.  Massachusetts' Statute ...............................171
    D.  New York's Act .......................................172

V   CONCLUSION ................................................172

## I  INTRODUCTION

Plaintiffs, trustees of the Massachusetts State Carpenters Health Benefits Fund ("Fund"), bring this action in their fiduciary capacity for damages suffered by the Fund due to "past and ongoing deceptive acts and practices and false advertising" by the major tobacco product manufacturers and related entities ("Tobacco"). Compl. ¶ 1. Plaintiffs seek recovery under New York's Consumer Protection Act. *See* N.Y.Gen.Bus.Law §§ 349–350. Competence is premised on diversity. *See* 28 U.S.C. § 1332(a)(1).

Allegedly, Tobacco engaged in deceptive conduct and false advertising that "had the effect of sustaining high levels of smoking among ... Fund participants," resulting in smoking-related diseases for which the Fund expended "millions of dollars in excess health care costs." Compl. ¶ 62. A substantial portion of this conduct is said to have either initiated or occurred in New York. *See* Compl. ¶¶ 149, 155.

Defendants have moved for dismissal on three grounds. *See* Fed.R.Civ.P. 12(b)(6). They argue the following: 1) New York's choice-of-law principles require application of Massachusetts' Unfair and Deceptive Trade Practices Statute rather than New York's Consumer Protection Act; 2) even if New York's Consumer Protection Act applies, it does not provide recovery for derivative injuries such as those the Fund alleges; and 3) even if the New York Act covers derivative injuries, the Fund is not within the class of persons protected by the Act.

Defendants are likely correct on the first ground, that the Massachusetts' Statute governs, making it unnecessary at this time to reach the remaining issues arising under the New York Act. Defendants' motion for dismissal is nonetheless denied; further discovery is necessary to aid final resolution of the conflicts issue. The complaint will be construed to state claims under comparable provisions of the Massachusetts' Statute. *See* Fed.R.Civ.P. 8(f).

## II  FACTUAL ALLEGATIONS

According to plaintiffs, today it is beyond dispute that cigarette smoking can lead to cancer, pulmonary diseases, and coronary heart disease. *See* Compl. ¶ 9. Cigarette smoking causes more than 85% of all lung cancer. It is responsible for at least 30% of all deaths from cancer and more than 80% of deaths from pulmonary diseases such as emphysema and bronchitis. *See* Compl. ¶ 9(a) & (b). It is also one of the three leading causes of coronary heart disease. *See id.* ¶ 9(c).

It is plaintiffs' contention that Tobacco has long known of the lethal health effects

of cigarette smoking, but nonetheless "engaged in a decades long scheme to create and perpetuate a false and deceptive 'controversy' about whether their products cause cancer and other diseases and are addictive." Compl. ¶ 2. As plaintiffs put it, "[t]he net effect [of Tobacco's conduct] ... has been to convey the message that intensive scientific research has uncovered no reliable evidence about the real health effects of smoking." Compl. ¶ 6.

Plaintiffs identify five categories of deceptive and unlawful conduct: (1) denying the addictiveness of cigarettes; (2) manipulating nicotine levels; (3) creating the appearance of an "open controversy" regarding health effects of smoking; (4) marketing cigarettes to teenagers; and (5) co-opting organized labor to deny smoking hazards.

Plaintiffs allege a substantial portion of this deceptive conduct was orchestrated and carried out in New York. In particular, plaintiffs cite the role that the Council for Tobacco Research (CTR), Tobacco's New York based trade organization, played in furthering the alleged national conspiracy regarding smoking. Plaintiffs also rely on the fact that Hill & Knowlton, Inc., an international public relations firm based in New York City, played an "active role in the [Tobacco] conspiracy ... by aiding the circulation and/or publication of many false statements of the tobacco industry attributable to the ... Council for Tobacco Research." Compl. ¶ 33.

Founded in 1954, the CTR was initially called the Tobacco Industry Research Committee (TIRC). See Compl. ¶ 69(a). All six of the major cigarette manufacturers were original members except for Liggett. See Compl. ¶ 61. In 1964, Liggett joined and the name was officially changed to CTR. See id.

According to plaintiffs, the formation of the TIRC was a result of the conspiracy. The presidents of the leading tobacco companies gathered in the Plaza Hotel in New York City on December 15, 1953. See Compl. ¶ 60. The meeting was coordinat-

ed by Hill and Knowlton to discuss recent disclosures about the dangers of cigarette smoking and to form an association "specifically charged with ... public relations" for the Tobacco industry as a whole. See Compl. ¶ 60(e).

On January 4, 1954, the formation of TIRC was announced "with newspaper advertisements placed in virtually every city with a population of 50,000 or more, reaching a circulation of more than 43 million Americans." Compl. ¶ 63. Among other claims, the announcement stated:

● We are pledging aid and assistance to the research effort into all phases of tobacco use and health" (Compl. ¶ 63(g));

● "For this purpose we are establishing a joint industry group.... This group will be known as TOBACCO INDUSTRY RESEARCH COMMITTEE" (Compl. ¶ 63(h));

● "In charge of the research activities of the Committee will be scientist of unimpeachable integrity and medical repute. In addition, there will be an Advisory Board of scientists disinterested in the cigarette industry" (Compl. ¶ 63(j)).

Plaintiffs contend that this and similar promises of "full disclosure and objective scientific research" by Tobacco regarding CTR's activities were "never fulfilled." Compl. ¶ 68. Rather, the CTR undertook research only "to aid the industry in its public relations and litigation battles" while "[r]esearch that would serve to confirm health risks of smoking was altered, destroyed, or concealed." Compl. ¶ 68.

Plaintiffs identify the following deceptive acts and practices of Tobacco operating through the CTR which occurred in New York:

● On November 22, 1977 CTR hosted a meeting in New York attended by representatives of the various tobacco companies during which CTR proposed grants for research on the ef-

fects of nicotine on the central nervous system (CNS). The tobacco companies rejected the proposal for fear to do so would "dig[ ] [their] own grave," Compl. ¶ 123, and instead "worked out a 'compromise' whereby Jacob Medinger & Finnegan ("Jacob Medinger"), CTR's law firm in New York ..., would 'pre-screen' all proposed CNS studies before submission to the independent scientists on CTR's Scientific Advisory Board," Compl. ¶ 124. According to plaintiffs, the effect was to withhold "from consideration by [CTR's scientists] proposed CNS grants that would have funded relevant research and that would have incriminated nicotine and exposed to the public the falsity of the Tobacco Industry's position that the adverse health effects and addictiveness of nicotine remained unproven." Compl. ¶ 124.

- On November 15, 1978, during a meeting in New York of various tobacco manufacturers' representatives to discuss the continued need for CTR, William Shinn, of Shook Hardy & Bacon, "explained that CTR's 'public relations' value must be considered and continued and that in order to counter the 'opposition's position' that 'the case is closed with regard to smoking and disease.... It is extremely important that the industry continue to spend their dollars on research to show that we don't agree that the case against smoking is closed.' " Compl. ¶ 126.

- During the period from 1977 to 1990, Tobacco's Committee of Counsel met in New York to select researchers and research projects as CTR special projects. "One of the criteria the Committee used to evaluate these proposed projects was whether the researchers had been successful in planting in scientific journals research that was useful to the Industry in perpetuating its public position that the adverse health effects of smoking were unproven."

- The CTR maintained in New York "a secret 'Literature Retrieval Division' which reviewed, digested and inputted into a computer data system for use by each tobacco company all significant published scientific literature on the effects of smoking and health." Compl. ¶ 128. This information was furnished to tobacco company legal departments and outside counsel for use during litigation.

In addition to the deceptive acts and practices allegedly undertaken by Tobacco through the CTR, plaintiffs contend that "deceptive and false press releases were routinely reported in New York papers and [that] deceptive and false television appearances were broadcast throughout the New York metropolitan area" by the individual companies, the CTR, and various other related Tobacco entities. Compl. ¶ 122; see, e.g., id. at ¶¶ 131–133.

Plaintiffs argue that these and related deceptive acts and false advertisements had the effect of sustaining high levels of smoking among the Fund's participants. This caused a higher incidence of disease among Fund participants, in turn resulting in millions of dollars in excess health care expenditures by the Fund. See Compl. ¶ 139. The trustees now seek recovery of these monies from Tobacco.

## III   STANDARD FOR DISMISSAL

In considering a Rule 12(b)(6) motion, dismissal is appropriate only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); see *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

The facts alleged in the complaint must be taken as true and liberally construed in the light most favorable to the plaintiffs. See *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir.1993). "The issue is not

whether [the] plaintiff will ultimately prevail but whether the [plaintiff] is entitled to offer evidence to support the claims." *Scheuer*, 416 U.S. at 236, 94 S.Ct. 1683.

## IV  CHOICE OF LAW

■■■ A federal court sitting in diversity applies the choice-of-law principles of the forum state, here New York, to decide which state's substantive law governs. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *see also Falise v. American Tobacco Co.*, 94 F.Supp.2d 316, 353–54 (E.D.N.Y. 2000) ("A choice of law question is presented when a dispute implicates the interests of two or more states and application of each state's law would be consistent with the Full Faith and Credit and Due Process Clauses of the Constitution.") (quoting *Hamilton v. Accu–Tek*, 47 F.Supp.2d 330, 335 (E.D.N.Y.1999) (internal quotation marks omitted)). The same choice-of-law principles that determine whether a plaintiff has a claim under a particular state's common law apply to resolve conflicts between application of competing states' statutes. *See, e.g., Volt Systems Development Corp. v. Raytheon Co.*, 155 A.D.2d 309, 309–10, 547 N.Y.S.2d 280 (1st Dept.1989) (applying New York choice-of-law principles to conclude Massachusetts' Unfair and Deceptive Trade Practices Statute governs dispute).

Defendants have challenged the application of New York's Consumer Protection Act to this dispute, contending that under New York's choice-of-law principles Massachusetts' Unfair and Deceptive Trade Practices Statute applies. *Cf. Celle v. Filipino Reporter Enter.*, 209 F.3d 163, 175 (2d Cir.2000) (where no party challenges choice of law, all are deemed to have implicitly consented).

### A.  Principles

■■■ New York has adopted an "interest analysis" for conflicts. *See, e.g., Babcock v. Jackson*, 12 N.Y.2d 473, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963) (Fuld, C.J.); *see generally*, Harold L. Korn, *The Choice of Law Revolution: A Critique*, 83 Colum.L.Rev. 772, 827 (1983). The hallmark of the interest analysis is that "[j]ustice, fairness and, the best practical result, may best be achieved by giving controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties has the greatest concern with the specific issue raised in the litigation." *Babcock*, 12 N.Y.2d at 481, 240 N.Y.S.2d 743, 191 N.E.2d 279 (internal quotation marks and citation omitted).

■■■ In undertaking the interest analysis, a conceptual distinction must be drawn between conduct-regulating and loss-allocating laws. *See, e.g., Cooney v. Osgood Machinery, Inc.*, 81 N.Y.2d 66, 72, 595 N.Y.S.2d 919, 612 N.E.2d 277 (1993) ("An immediate distinction was drawn between laws that regulate primary conduct (such as standards of care) and those that allocate losses after the tort occurs (such as vicarious liability)."); *see also Hamilton*, 47 F.Supp.2d 330, 337 (E.D.N.Y.1999) ("Loss allocation and conduct regulation are not rigid categories. The distinction between them serves as a proxy for the ultimate question of which state has the greater interest in having its law applied."). Loss-allocating rules are "those which prohibit, assign, or limit liability after a tort occurs, such as charitable immunity statutes, guest statutes, wrongful death statutes, vicarious liability statutes, and contribution rules." *Hamilton*, 47 F.Supp.2d at 336 (quoting *Padula v. Lilarn Properties Corp.*, 84 N.Y.2d 519, 521, 620 N.Y.S.2d 310, 644 N.E.2d 1001 (1994) (internal quotation marks omitted)). "Conduct-regulating rules are those which have the prophylactic effect of governing conduct to prevent injuries from occurring." *Id.* (quoting *Padula*, 84 N.Y.2d at 521, 620 N.Y.S.2d 310, 644 N.E.2d 1001 (internal quotation marks omitted)).

The consumer protection laws in question are conduct-regulating. These laws seek to prevent deceptive acts and prac-

tices and false advertising by merchants, service providers, and manufacturers that will adversely affect consumers and others. *See, e.g.,* N.Y.Gen.Bus.Law § 349(a) ("Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful."); N.Y.Gen.Bus. Law § 350 ("False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."); M.G.L.A. c. 93A, § 2 ("Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."); *see also* Joseph Thomas Moldovan, Note, *New York Creates a Private Right of Action to Combat Consumer Fraud: Caveat Venditor,* 48 Brook.L.Rev. 509, 568 (1982) ("unjustified consumer injury is the primary focus of the Act").

A general rule has developed for conduct-regulating laws: "where the defendant's tortious conduct and the plaintiff's injury occur in different states 'the place of the wrong is considered to be the place were the last event necessary to make the actor liable occurred.'" *Hamilton,* 47 F.Supp.2d at 337 (quoting *Schultz v. Boy Scouts of America, Inc.,* 65 N.Y.2d 189, 196–97, 491 N.Y.S.2d 90, 480 N.E.2d 679 (1985)). For actions sounding in fraud and deceit, the substantive law of the state in which the injury is suffered, rather than the state where the fraudulent conduct was initiated, usually governs. *See, e.g., Sack v. Low,* 478 F.2d 360, 365 (2d Cir. 1973) ("[W]hen a person sustains loss by fraud, the place of wrong is where the loss is sustained, not where fraudulent representations are made."); *Sound Video Unlimited v. Video Shack Inc.,* 700 F.Supp. 127, 134 (S.D.N.Y.1988) (in fraud and related actions, last event necessary is where the loss is suffered); *Natural Resources Corp. v. Royal Resources Corp.,* 427 F.Supp. 880, 882 (S.D.N.Y.1977) ("Such a claim has been said to arise where 'plaintiffs' pocketbooks are situated.' "); *cf. In re Smith Barney, Harris Upham & Co.,* 85

N.Y.2d 193, 207, 623 N.Y.S.2d 800, 647 N.E.2d 1308 (N.Y.1995) (for purposes of the borrowing statute, securities fraud claims accrued "where the injury occurred—generally, the place where the investors resided and sustained the economic impact of the loss").

The national and worldwide scope of the deceptive conduct and false advertising alleged to have injured the Fund somewhat undermines the usefulness of this general principle—usually applied to more limited and localized disputes—which was developed to resolve conflicts disputes in more run-of-the-mill fraud-based actions. Rather, a return to the bedrock principle announced in *Babcock* —that "controlling effect [should] be given to the law of the jurisdiction which has the greatest interest in the specific issues raised in the litigation"—is warranted. *See Falise,* 94 F.Supp.2d 316, 353–54 (E.D.N.Y.2000).

### B. Application

Resolution of the choice-of-law question requires a balancing of the interests of New York and Massachusetts in the dispute.

As detailed in plaintiffs' complaint and as catalogued above, substantial portions of the alleged conspiracy by Tobacco were orchestrated in New York. *See, e.g., Simon v. Philip Morris, Inc.,* 86 F.Supp.2d 95, 107 (E.D.N.Y.2000). CTR, which was a major vehicle for perpetuating Tobacco's alleged conspiracy, operated in New York. A number of critical meetings of Tobacco representatives necessary to perpetuate the scheme allegedly occurred in New York, and at least one of the companies, Philip Morris, Inc., has its principal place of business in New York. New York has an obvious and substantial interest in ensuring that it does not become either a base or a haven for law breakers to wreak injury nationwide.

Balanced against this is Massachusetts' interests. The Fund itself is a Massachusetts entity, with all but one of its trustees

being a Massachusetts resident. The Fund was set up by a Massachusetts labor union; it was funded by that union and Massachusetts employers. The Fund provides medical insurance primarily to residents of Massachusetts, who presumably received and acted upon Tobacco's alleged deceptive conduct in Massachusetts. These factors, taken together, ensure that the lions share of adverse economic and health effects from Tobacco's alleged deceptive conduct, as relevant to this action, were felt in Massachusetts.

New York's interest, which as noted is a weighty concern for preventing New York from becoming a haven for national conspiracies foisted on the American public, appears at this stage of the controversy to be outweighed by Massachusetts' greater interest in protecting the economic welfare of its instate corporate entities and in preventing the dissemination of deceptive information injurious to its residents.

In view of the substantial interests of Massachusetts, it appears probable that after discovery is completed the court will find that under New York's conflict rules, Massachusetts has the greater interest in the pending action. It is, however, premature at this stage to dismiss plaintiffs' claims under the New York Consumer Protection Act. *See* N.Y.Gen.Bus.L. §§ 349(a), 350.

Fuller discovery in this and the related tobacco cases now pending in this court and elsewhere may shed a different light on the degree of interest of New York and of other states. Accordingly, discovery may proceed without a final decision on whether plaintiffs claims are more appropriately brought under the Massachusetts Unfair and Deceptive Trade Practices Statute. *See* M.G.L.A. c. 93A, § 1 *et seq.*

### C. Massachusetts' Statute

Plaintiffs contend that the Massachusetts Statute does not cover Tobacco's conduct and that therefore a conflicts analysis is inappropriate. Specifically, plaintiffs claim that section 11—which prohibits businesses from bringing suit under the Massachusetts Statute unless the deceptive acts occurred "primarily and substantially within" Massachusetts—precludes application of the Statute and thus counsels in favor of applying New York's Consumer Protection Act. *See* M.G.L.A. c. 93A, § 11; *see also Makino, U.S.A., Inc. v. Metlife Capital Credit Corp.*, 25 Mass.App. Ct. 302, 518 N.E.2d 519, 523 n. 4 (1988) (legislative history).

In *Clinton Hospital Assoc. v. Corson Group, Inc.*, 907 F.2d 1260 (1st Cir.1990), the court of appeals for the First Circuit identified a three factor balancing test to determine whether the Massachusetts Statute applies. The first factor "requires consideration of where the defendant committed the deceptive or unfair acts or practices" in question. *Id.* at 1265. Relevant to the court's consideration in *Clinton Hospital* was the fact that "although the acts [allegedly committed by the defendant] originated in New York, it was intended that their force and input influence the plaintiff's behavior in Massachusetts." *Id.* The second factor looks to "where the plaintiff received and acted upon the deceptive or unfair statements." *Id.* The third factor "requires courts to look at the situs of plaintiff's losses due to the unfair or deceptive acts or practices." *Id.* at 1266.

All three factors appear to support application of the Massachusetts' Statute. *Sonesta Inter. Hotels Corp. v. Central Florida Investments, Inc.*, 47 Mass.App. Ct. 154, 712 N.E.2d 607, 610 (1999) (whether transactions or actions occurred primarily within the commonwealth is a "question of law" for the court). With respect to the first factor, even assuming Tobacco's deceptive conduct was orchestrated outside of Massachusetts', the deceptive practices were intended to effect the smoking patterns of Massachusetts' residents, among others. As for the second factor, a substantial majority of the Fund's participants "received and acted upon the deceptive

and unfair statements" in Massachusetts. And with respect to the third factor, the Fund's losses occurred in Massachusetts. Taken together, all three factors do counsel in favor of an ultimate finding that Tobacco's deceptive conduct occurred "primarily and substantially within the Commonwealth of Massachusetts," supporting a claim under the Massachusetts Unfair and Deceptive Trade Practices Statute. *See also* M.G.L.A. c. 93A, § 11 ("[T]he burden of proof shall be upon the person claiming that such transactions and actions did not occur primarily and substantially within the commonwealth.").

### D. New York's Act

It deserves noting that although plaintiffs in this action may ultimately be foreclosed from suing under New York's Consumer Protection Act, defendants are not exempt from the regulatory regime established by the Act. Either New York residents or the New York Attorney General could bring suit under New York's Consumer Protection Act for the deceptive conduct alleged. *See* N.Y.Gen.Bus.L. §§ 349(b), 350–c (authorizing suit by the Attorney General of New York); *see also Ortho Pharmaceutical Corp. v. Cosprophar, Inc.*, 32 F.3d 690, 697 (2d Cir.1994) ("In order to establish a claim under either section, a plaintiff must show (i) that the act or practice was misleading in a material respect, and (ii) that the plaintiff was injured." (citation and internal quotation marks omitted)).

The question presented here is a narrow one: whether plaintiffs, in accordance with New York's choice-of-law principles, can bring suit under the Act rather than under Massachusetts' Unfair and Deceptive Practices Statute. It is not whether Tobacco's alleged conduct falls within the reach of New York's Consumer Protection Act generally.

### V CONCLUSION

Defendants' motion to dismiss is denied with leave to renew upon further develop-

ment of the litigation. At present, the threshold conflicts issue is not ripe for final decision.

Discovery shall continue under the supervision of the magistrate judge with every effort made to utilize materials already available from the related tobacco litigations already pending in this court.

SO ORDERED