Ellis SIMON; Trudy Hunt; Tony Younany; George Oko; Jacqueline Hounchell; Sylvia Whol, Larry Abbott; Estate of George E. Patterson; Estate of Willie Grier; Estate of Joyce Fogliano; Estate of Virginia Overstreet; Estate of Evelyn Schrieber; and Estate of Stanley Kesselman, on behalf of themselves and all other persons similarly situated, Plaintiffs,

v.

PHILIP MORRIS INCORPORATED; R.J. Reynolds Tobacco Company; Brown and Williamson Tobacco Corporation; B.A.T. Industries, P.L.C. The American Tobacco Company; Lorillard Tobacco Company, Inc.; and Liggett & Myers, Inc., Defendants.

(Simon I).

No. 99 CV 1988.

United States District Court,
E.D. New York.

Dec. 7, 2000.

Law Offices of Peter G. Angelos, P.C., Baltimore, MD by Joshua Kassner, John Angelos, O'Donoghue & O'Donoghue, Washington, DC, for Plaintiff National Asbestos.

Milberg Weiss Bershad Hynes & Lerach, New York City by Melvyn I. Weiss, Beth A. Kaswan, Michael C. Spencer, for Plaintiff Bergeron.

Dewey Ballantine, LLP, New York City by Vincent Fitzpatrick, Heather K. McDevitt, Joseph Angland, for Plaintiff Blue Cross/Blue Shield.

Weitz & Luxenberg, New York City by Richard L. Akel, Lieff, Cabraser, Heimann, & Bernstein, New York City by Steven E. Fineman, Elizabeth J. Cabraiser, Roda & Nast, P.C., Lancaster, PA, by Dianne M. Nast, Wait, Chesley, Waite, Schneider, Bayless & Chesley, Cincinnati, OH by Stanley Chesley, Jonathan W. Cuneo, Washington, DC, Brown Rudnick Freed & Gesmer, Boston, MA by Gregory T. Carnold, Wayne F. Dennison, Sheller Ludwig & Badley Philadelphia, PA, by Charles Mangan, for Plaintiff in Simon I & Simon II.

Ness Motley Loadholt, Richardson & Poole, Mount Pleasant, SC, Orrick Herrington & Sutcliffe, LLP, New York City by Peter A. Bicks, James L. Stengel, Michael T. Stolper, for Plaintiff Falise.

Sedgwick, Detert, Moran & Arnold, New York City by Kevin J. Dunne, Eric M. Kraus, Kirkland & Ellis, New York

City by Marjorie P. Lindblom, David Bernick, Andrew R. McGaan, Deirdre A. Fox, Boston, MA by U. Gwyn Williams, Winston & Strawn, Chicago, IL, for Defendant Brown & Williamson.

Shook, Hardy & Bacon, LLP, Kansas City, MO by William L. Allinder, Lori Connors McGroder, for Defendant Lorillard Tobacco Co.

Harold Keith Gordon, Byron G. Stier, Jones, Day, Reavis & Pogue, New York City, Hugh R. Whiting, Theodore M. Grossman, Mark A. Belasic, Jones, Day, Reavis & Pogue, Cleveland, OH, Jerome R. Doak, Margaret I. Lyle, Jones, Day, Reavis & Pogue, Dallas, TX, Womble Carlyle Sandridge & Rice, Winston-Salem, NC, by Ursula M. Henninger, for Defendant R.J. Reynolds.

Greenberg Traurig, LLP, New York City by Alan Mansfield, Robert J. Kirshenberg, Stephen L. Saxl, for Defendant Lorillard Tobacco.

Simpson Thacher & Bartlett, New York City by Adam I. Stein, for Defendant British American Tobacco.

Goodwin, Proctor & Hoar, LLP, Boston, MA, by U. Gwyn Williams, Winston & Strawn, Chicago, Ill, Dechert Price & Rhoads, New York City, by Peter L. Critchell, Collier, Shannon, Rill & Scott, Washington, DC by John B. Williams, Thomas W. Mitchell, Goodwin, Proctor & Hoar, Boston, MA by Kenneth J. Parsigian, Paul E. Namser, Arnold & Porter, Washington, DC by Murray R. Garnick, Peter Bleakley, for Defendant Philip Morris.

Debevoise & Plimpton, New York City by Anne E. Cohen, Harry Zirlin, Steven S. Michaels, for Defendant Council for Tobacco Research USA, Inc.

Davis & Gilbert LLP, New York City by Bruce J. Ginsberg, for Defendant Hill & Knowlton.

Seward & Kissel LLP, New York City by Jacob Horowitz, for Defendant Tobacco Institute.

Jacob Medinger & Finnegan, New York City by Bryan A. McKenna, for Defendant Smokeless Tobacco.

Skadden Arps Slate Meaher & Flom, New York City by Arthur H. Aizley, Eric S. Sarner, for Defendant U.S. Tobacco.

Kasowtiz Benson Torres & Friedman, New York City by Leonard A. Feiwus, for Defendant Liggett.

Chadbourne & Parke, LLP, New York City by Robert S. Pruyne, for Defendant British American Tobacco.

## MEMORANDUM & ORDER

WEINSTEIN, Senior District Judge.

### TABLE OF CONTENTS

I. Introduction ........................................................ 49

II. Pending Tobacco Cases ............................................. 50
 A. H.K. Porter Company v. B.A.T. Industries, et al .............. 51
 B. National Asbestos v. Philip Morris, Incorporated, et al ...... 51
 C. Blue Cross and Blue Shield, et al. v. Philip Morris, Incorporated, et al ...... 52
 D. Simon, (formerly Stugeon) et al. v. Philip Morris, Incorporated, et al. ........... 52
 E. Bergeron, et al. v. Philip Morris, Incorporated, et al. ...................... 52
 F. Falise, et al. v. American Tobacco, et al. ................................ 52
 G. William Decie, et al. v. American Tobacco, et al. ........................ 52
 H. James Mason, et al. v. American Tobacco, et al. .......................... 53
 I. James Ebert v. Philip Morris, Incorporated, et al. ....................... 53
 J. Simon, et al. v. American Tobacco, et al. ................................ 53
 K. Raymark Industries v. American Tobacco, et al. ........................... 53

III. Choice of Law ....................................................... 53
 A. Choice of Law Revolution: Mechanical Lex Loci to Pragmatic Interests ...... 54

1. Babcock v. Jackson ..............................................54
2. Refinements to Babcock ........................................57
 a. Schultz ...................................................58
 b. Cases Involving Mass Disasters ............................60
 i. Airplane Crashes ........................................60
 ii. Products liability .....................................61
3. History .......................................................62
 a. Antiquity .................................................63
 b. Middle Ages ...............................................64
 c. English Law ...............................................64
 d. The Nineteenth Century and Early American Conflicts Law ...64
 e. Current Choice of Law Theory in the United States .........66
4. Scholarship, Comparative Statutory Law, and Precedent in Complex Litigation ..............................................67
B. Constitutional Limits ..........................................69
C. Interest Analysis ..............................................71
 1. New York's Conflicts of Law Principles .....................71
 2. New York's Interests In The Instant Dispute ................72
 3. Depecage ...................................................75
D. Manageability .................................................77
E. Summation .....................................................77

IV. Conclusion ...................................................78

## I. *Introduction*

In *Simon I* (99 CV 1988), a class claims pursuant to Rule 23 of the Federal Rules of Civil Procedure: (1) compensatory damages for cancer due to its members' smoking, and (2) punitive damages. *Simon II* (00 CV 5332) involves a broader class of all persons who may have been injured by tobacco; it includes those suing in *Simon I. See Simon v. Philip Morris Inc.*, 2000 WL 1658337 (E.D.N.Y., Nov 06, 2000) (NO. 99 CV 1988).

It is suggested that, with limited exceptions described below, the individual and class action suits pending in this court (*see* Part II, *infra* ), be tried as part of *Simon II;* all of their allegations and claims would be embodied in *Simon II*. The parties may amend *Simon II* to include additional claims for tobacco-related injuries due to passive exposure of non-smokers and in other respects to cover the universe of private Tobacco claims covered by the proposed *Simon II* class action.

A sampling of individual compensatory claims could be tried in *Simon II* in connection with the compensation opt-out class. Trial in this court would permit decision on general issues of fact and law such as fraud and general causation appli-cable to the entire *Simon II* opt-out class. Individual's compensation claims could then be transferred to appropriate federal district courts throughout the country for decision on such issues as individual causation, individual damages and individual statutes of limitations defenses.

The number of individual compensatory claims tried in this court might be sufficient, if selected according to appropriate statistical and other principles, to provide a basis for determination of total probable compensatory damages throughout the nation. This projection might permit the jury in this court to fix total allowable punitive damages for the nation in the *Simon II* non-opt-out punitive class, to be disbursed in a modified form of fluid recovery to health, research and other protective institutions and to persons injured by tobacco requiring special assistance.

*Daubert* and other hearings would be required to determine the statistical viability of models supporting this approach. A number of such hearings have already been held and rulings made in cases being prepared for trial in this court. *See* Part II, *infra.*

While *Simon II* is being prepared for trial there appears to be no reason why

the individual claims already scheduled for trial should not go forward. A number of other individual cases may also be set for trial while preparation of the *Simon II* trial is underway.

It is appropriate to deal with the issue of class action certification in *Simon II* rather than in *Simon I*. *Simon II*, as ultimately amended, would then cover all private claims for injury as a result of Tobacco's activities, with some exceptions. *See, e.g., United States v. Philip Morris, Inc.,* 116 F.Supp.2d 116, 2000 Daily Journal D.A.R. 10,769 (D.D.C.2000) (federal claim for reimbursement); *National Association of Attorneys General, Multistate Settlement with the Tobacco Industry,* (visited Nov. 13, 2000) ( *http://www.tobacco.neu.edu/Extra /multistatesettlement.htm* (state claims)).

Certification issues in *Simon II* appear to be essentially the same as those presented in *Simon I*, though slightly more complex in view of the broader scope and number of subclasses in *Simon II*. It is consonant with Rule 16 of the Federal Rules of Civil Procedure to structure the Tobacco cases pending in this court so as to limit the number of proceedings and of trials, as well as of appeals pursuant to Rule 23(f) of the Federal Rules of Civil Procedure.

Accordingly, the application for certification of *Simon I* was denied with a stay of the end of tolling of statutes of limitations. *See Simon v. Philip Morris Inc.,* 2000 WL 1658337 (E.D.N.Y., Nov.6, 2000) (No. 99 CV 1988); *see also, The National Asbestos Workers Medical Fund v. Philip Morris, Inc.,* 2000 WL 1424931 (E.D.N.Y. Sept.26, 2000) (stay of tolling). *Simon II*, as a class action, has an independent tolling effect.

The court will attempt to assist the parties in addressing issues likely to arise in preparation of *Simon II* for trial by issuing memoranda on such subjects as the propriety of the use of statistics to project probable compensatory damages as a predicate for punitive damages; Seventh Amendment implications of allowing separate juries to decide separable issues; and Rule 23 procedural issues, such as selecting subclass and class counsel, notifying members of the class, and using various methods to permit effective communication with members of the class and input of class members wishes.

Part II of this memorandum includes a summary of pending cases. Part III discusses of choice of law.

## II. Pending Tobacco Cases

The pending Tobacco cases in this court have been the subject of many motions and orders in contemplation of trials. *See Simon v. Philip Morris Inc.,* No. 99 CV 1988, 2000 WL 1658337 (E.D.N.Y., Nov 06, 2000); *Simon v. Philip Morris Inc.,* 194 F.R.D. 73 (E.D.N.Y.2000); *Simon v. Philip Morris, Inc.,* 86 F.Supp.2d 95 (E.D.N.Y. 2000); *National Asbestos Workers Medical Fund v. Philip Morris, Inc.,* No. 98 CV 1492, 2000 WL 1424931 (E.D.N.Y., Sep 26, 2000); *National Asbestos Workers Medical Fund v. Philip Morris, Inc.,* No. 98 CV 1492, 2000 WL 1364358 (E.D.N.Y., Sep 20, 2000); *National Asbestos Workers Medical Fund v. Philip Morris, Inc.,* No. 98 CV 1492, 2000 WL 777834 (E.D.N.Y., Jun 13, 2000); *National Asbestos Workers Medical Fund v. Philip Morris, Inc.,* 86 F.Supp.2d 137 (E.D.N.Y.2000); *National Asbestos Workers Medical Fund v. Philip Morris, Inc.,* 71 F.Supp.2d 139 (E.D.N.Y. 1999); *National Asbestos Workers Medical Fund v. Philip Morris, Inc.,* 74 F.Supp.2d 221 (E.D.N.Y.1999); *National Asbestos Workers Medical Fund v. Philip Morris, Inc.,* 74 F.Supp.2d 213 (E.D.N.Y. 1999); *National Asbestos Workers Medical Fund v. Philip Morris Inc.,* 23 F.Supp.2d 321 (E.D.N.Y.1998); *National Asbestos Workers Medical Fund v. Philip Morris Inc.,* No. 97 CV 1492, 1998 WL 372410 (E.D.N.Y.1998); *Falise v. American Tobacco Co.,* No. CV 99–7392, 2000 WL 1370437 (E.D.N.Y., Sep 21, 2000); *Falise v. American Tobacco Co.,* No. CV.

99–7392, 2000 WL 1336697 (E.D.N.Y., Sep 15, 2000); *Falise v. American Tobacco Co.*, No. CV 99–7392, 2000 WL 1292671 (E.D.N.Y., Sep 08, 2000); *Falise v. American Tobacco Co.*, 107 F.Supp.2d 200 (E.D.N.Y.2000); *Falise v. American Tobacco Co.*, No. CV 99–7392, 2000 WL 1144697 (E.D.N.Y., Jul 25, 2000); *Falise v. American Tobacco Co.*, No. CV 99–7392, 2000 WL 1010982 (E.D.N.Y., Jul 19, 2000); *Falise v. American Tobacco Co.*, No. CV 99–7392, 2000 WL 1010978 (E.D.N.Y., Jul 18, 2000); *Falise v. American Tobacco Co.*, 94 F.Supp.2d 316 (E.D.N.Y 2000); *Falise v. American Tobacco Co.*, No. 99 CV 7392, 2000 WL 433097 (E.D.N.Y., Apr 18, 2000); *Falise v. American Tobacco Co.*, 91 F.Supp.2d 525 (E.D.N.Y.2000); *Falise v. American Tobacco Co.*, No. 99 CV 7392, 2000 WL 264332 (E.D.N.Y., Jan 24, 2000) (No. CV–98–1492, CV–97–7658, CV–98–3287, CV–98–675); *Falise v. American Tobacco Co.*, 193 F.R.D. 73 (E.D.N.Y.2000); *Falise v. American Tobacco Co.*, 241 B.R. 63 (E.D.N.Y.1999); *Falise v. American Tobacco Co.*, 241 B.R. 48 (E.D.N.Y.1999); *Falise v. American Tobacco Co.*, No. 99 CV 7392, 1999 WL 98626 (E.D.N.Y., Feb 18, 1999) (No. 97 CV 7640, 97 CV 7658, 98 CV 675); *Falise v. American Tobacco Co.*, No. 97–CV–7640, 1998 WL 372401 (E.D.N.Y., Jul 02, 1998); *Blue Cross and Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.*, 113 F.Supp.2d 345 (E.D.N.Y. 2000); *Blue Cross and Blue Shield of New Jersey v. Philip Morris, Inc.*, 53 F.Supp.2d 338 (E.D.N.Y.1999); *Blue Cross and Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.*, 36 F.Supp.2d 560 (E.D.N.Y.1999); *Blue Cross and Blue Shield of New Jersey, Inc. v. Phillip Morris, Inc.*, No. 98 CV 3287, 1999 WL 104815 (E.D.N.Y., Feb 25, 1999); *Bergeron v. Philip Morris, Inc.*, 100 F.Supp.2d 164 (E.D.N.Y.2000); *Bergeron v. Philip Morris, Inc.*, No. 99 CV 6142, 2000 WL 748144 (E.D.N.Y., Jun 08, 2000); *H.K. Porter Co., Inc. v. American Tobacco Co.*, 71 F.Supp.2d 73 (E.D.N.Y. 1999); *In re Tobacco Litigation, Eastern Dist. of New York*, 193 F.R.D. 92 (E.D.N.Y.2000); *In re Tobacco Litigation,* 192 F.R.D. 90 (E.D.N.Y.2000); *In re Simon (II) Litigation,* No. 00 CV 5332, 2000 WL 1252182 (E.D.N.Y., Sep 06, 2000) (98 CV 0675, 99 CV 6142, 98 CV 1492, 97 CV 7658, 99 CV 1988, 98 CV 3287, 99 CV 7392, 00 CV 4632).

Set out below are brief descriptions of the pending cases.

A. *H.K. Porter Company v. B.A.T. Industries, et al,* 97 CV 07658 (filed 12/31/97).

Plaintiff has paid substantial sums to those injured by inhaling residuals of its asbestos products. It sues tobacco producers to recover that portion of damages attributable to smoking. Motions to dismiss for failure to state a cause of action, for lack of jurisdiction and to settle discovery disputes have been decided. A trial date has not been set, but discovery is largely covered by that in related cases so that the case is almost ready for trial. *See* docket entries 1–148.

A writ of mandamus sought by defendants was denied by the court of appeals. *See* docket entry 149. The punitive damage aspects are stayed with the view that they can be dealt with in *Simon II.*

B. *National Asbestos v. Philip Morris, Incorporated, et al,* 98 CV 01492 (filed 2/27/98).

This case was brought as a class action on behalf of some four thousand "collectively-bargained" health and welfare trust funds. The putative class members are "all self insured, multi-employer benefit plans ... in the building trades and their trustees." They seek to recover money expended for health and welfare benefits for fund beneficiaries injured by tobacco.

A variety of dispositive motions have been denied. Discovery has been extensive; a series of discovery orders has been issued. Certification of the class has been denied and this order is being appealed. *See* docket entries 393–399.

The court is prepared to try one of the cases in the class as a "test." It will then reconsider the certification issue. Discovery and other motion practice has proceeded sufficiently to permit an early trial of a test case. *See* docket entries 1–40. A trial date for May 12 has been tentatively set by the magistrate judge. The punitive damage aspects are stayed as in *H.K. Porter. See* Part II A, *supra.*

C. *Blue Cross and Blue Shield, et al v. Philip Morris Incorporated, et al.,* 98 CV 03287 (filed 4/29/98).

Twenty-six Blue Cross/Blue Shield health care plans located across the country bring claims similar to those in *National Asbestos.* A series of dispositive, *Daubert,* and *in limine* motions have been decided. Discovery, *Daubert,* and *in limine* practice has gone forward to the point where a test case can be tried. *See* docket entries 1–616. Trial of the claims of Empire Blue Cross and Blue Shield of New York has been set to follow the trial in *Falise,* Part F, *infra. See* docket entry 510. The punitive damage aspects are stayed as in *H.K. Porter. See* Part II A, *supra.*

D. *Simon, (formerly Stugeon) et al. v. Philip Morris Incorporated, et al.,* 99 CV 01988 (filed 04/09/99) (Simon I).

This is a national class action on behalf of:

All persons residing in the United States, or who were residents of the United States at the time of their deaths, who have a 20 pack-year history of smoking Defendants' cigarettes and who, individually or through an estate or other legal representative, had a timely claim as of April 9, 1999 for personal injury damages or wrongful death arising from cancer of the lung. A pack-year is one package of cigarettes consumed per day per year.

A series of dispositive and discovery motions have been decided, but the case is not yet ready for trial. *See* docket entries 1–150. A motion for certification, as already noted, has been denied. *See* Part I, *supra.* The punitive damage aspects are stayed as in *H.K. Porter. See* Part II A, *supra.*

E. *Bergeron, et al. v. Philip Morris, Incorporated, et al.,* 99 CV 06142 (filed 9/29/99).

Plaintiffs, trustees of the Massachusetts State Carpenters Health Benefits Fund, bring this action on somewhat the same grounds as *National Asbestos,* Part II B, *infra.* A series of disposition and discovery motions have been decided, but the case is not ready for trial. *See* docket entries 1–61. The punitive damages aspects are stayed as in *H.K. Porter. See* Part II A, *supra.*

F. *Falise, et al. v. American Tobacco, et al.,* 99 CV 7392 (filed 11/12/99).

This is essentially the same case as one brought earlier, which was dismissed on jurisdictional grounds. Extensive dispositive, discovery *Daubert* and *in limine* motions have been decided. *See* docket sheet entries 1–515. It was set for trial in July of this year, but was stayed by the court of appeals pending a decision on a mandamus petition. Mandamus has now been denied, and the trial has commenced. The punitive damage aspects were stayed as in *H.K. Porter. See* Part II A, *supra,* but the parties have been informed that, should there be a viable claim for such damages, punitive damage issues will be tried on a bifurcated basis following the ongoing trial on compensatory damages.

G. *William Decie, et al v. American Tobacco, et al.,* 2000 CV 02340 (filed 4/21/2000).

This class action has not proceeded far. Stipulations extending time to answer have been filed. *See* docket entries 1–14. The punitive damage aspects are stayed as in *H.K. Porter. See* Part II A, *supra.*

H. *James Mason, et al v. American Tobacco, et al.* 2000 CV 0442 (filed 08/01/2000).

This class action was transferred from the Northern District of Texas (97 CV–293–R). It has not proceeded appreciably in this court. *See* docket entries 1–32. A motion has been made, but not decided, to consolidate this case with *Simon II* as a subclass. *See* docket entry 32. The punitive damage aspects are stayed as in *H.K. Porter. See* Part II A, *supra.*

I. *James Ebert v. Philip Morris, Incorporated, et al.,* 2000 CV 04632 (filed 8/09/2000).

This action has not proceeded appreciably. *See* docket entry 1. The punitive damage aspects are stayed as in *H.K. Porter. See* Part II A, *supra.*

J. *Simon, et al. v. American Tobacco,* 2000 CV 05332 (filed 09/06/2000) (Simon II).

This class action includes as subclasses all the tobacco cases pending except *Decie. See* Part G. It seeks both compensatory and punitive damages. While motion and discovery proceedings have not been extensive in this case, they are fairly advanced because the case incorporates all the related proceedings described in Parts A–I. *See* docket entries 1–18. The parties have proposed counsel to represent the subclasses. A request for approval of subclass counsel was ordered published. *See In Re Simon II,* order dated October 23, 2000.

K. *Raymark Industries v. American Tobacco, et al.,* 1998 CV 0675 (filed 01/30/98).

After considerable preparation for trial in the Eastern District of New York the case was transferred to the Eastern District of Pennsylvania by the Multidistrict Litigation Panel. *See* docket entries 1–74. A motion to retransfer the case to this court is pending elsewhere. The case is similar to the *Falise* case. *See* Part II F, *supra.*

III. *Choice of Law*

This memorandum deals primarily with conflicts of laws as they affect an opt-out compensatory national class. The proposed non-opt out, national punitive damage class will be treated in a separate memorandum. The need to fix and limit punitive damages in one proceeding because of constitutional and, perhaps, asset constraints on the defendants, in addition to different punitive rules among the states and proposals to devote the punitive damage recovery to national research, treatment and the special needs of particular injured persons suggests that punitive damage conflicts issues be addressed separately.

A choice of law question is presented when a dispute implicates the interests of two or more states and application of each state's law would be consistent with the Full Faith and Credit and Due Process Clauses of the Constitution. *See Diehl v. Ogorewac,* 836 F.Supp. 88, 91 (E.D.N.Y.1993); *Cooney v. Osgood Machinery,* 81 N.Y.2d 66, 70–71, 612 N.E.2d 277, 279, 595 N.Y.S.2d 919, 921 (1993). These modest constitutional requirements are met if each state whose law is sought to be applied has "significant contacts or significant aggregation of contacts creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *Allstate Ins. Co. v. Hague,* 449 U.S. 302, 313, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981). *See also Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 818–23, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985).

A federal court sitting in diversity applies the choice of law principles of the forum state, in this case New York, to decide which state's substantive law controls. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Choice of law rules apply equally to claims brought under

common law and statutory law. *See, e.g., Bergeron v. Philip Morris,* 100 F.Supp.2d 164, 170 (2000) (applying New York choice of law rules to resolve conflicts between the New York Consumer Protection Act and Massachusetts' Unfair Deceptive Trade Practices Act); *see also Volt Systems Development Corp. v. Raytheon Co.,* 155 A.D.2d 309, 309–310, 547 N.Y.S.2d 280 (N.Y.App.Div.1989) (applying New York choice of law principles to Massachusetts' Unfair Deceptive Trade Practices Act).

■ For federal substantive law issues the court will apply the applicable national law (subject to circuit and district differences). Where both state and federal substantive claims are made in the same case—as here—the law of *Klaxon* continues to apply to state issues. In practice, however there is a tendency to emphasize forum law, for ease of administration of the litigation, as by utilization of state and federal jury charge books the judge is likely to have on chambers shelves.

A. *Choice of Law Revolution: Mechanical Lex Loci to Pragmatic Interests*

1. *Babcock v. Jackson*

More than a third of a century ago, a sharp change in choice of law standards resulted when Chief Judge Stanley Fuld published his widely followed opinion in *Babcock v. Jackson,* 12 N.Y.2d 473, 191 N.E.2d 279, 240 N.Y.S.2d 743 (1963). *See Hamilton v. Accu–Tek,* 47 F.Supp.2d 330, 335 (E.D.N.Y.1999); Maurice Rosenberg et al., *Conflict of Laws* (Teacher's Manual) 86 (10th ed.1996) ("Babcock is widely regarded as the landmark case that began the change in approaches to choice of law by United States courts."); Harold L. Korn, *The Choice of Law Revolution: A Critique,* 83 Colum.L.Rev. 772, 827 (1983). *Babcock* adopted for New York an "interest analysis" for torts conflicts departing from the American standard application of *lex loci delicti,* the law of the place of the wrong. *Compare* 2 J. Beale, *A Treatise*

*on the Conflict of Laws* 1288 (1935) ("It is impossible for a plaintiff to recover in tort unless he has been given by some law a cause of action in tort; and this law can only be given by the law where the tort was committed.").

The foundation of this current approach is that: "[j]ustice, fairness and, the best practical result, may best be achieved by giving controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties has the greatest concern with the specific issue raised in the litigation." *Babcock v. Jackson,* 12 N.Y.2d at 481, 191 N.E.2d 279, 240 N.Y.S.2d 743 (internal quotation marks and citation omitted). Since *Babcock* requires a return to basic principles, eschewing mechanical rules in favor of a practical analysis of the interests of the various states involved, Judge Fuld's historic words bear repeating. He first noted that various "factors ... relevant to the purpose served by the enforcement or denial of the remedy must be evaluated." 12 N.Y.2d at 477, 240 N.Y.S.2d 743, 191 N.E.2d 279.

> The question presented is simply drawn. Shall the law of the place of the tort invariably govern the availability of relief for the tort or shall the applicable choice of law rule also reflect a consideration of other factors which are relevant to the purposes served by the enforcement or denial of the remedy?

*Id.*

The answer to this question was a resounding affirmation of the need to consider other factors. *Babcock,* as the opinion pointed out, was a single case, "where the conduct causing the injury and the injury itself occurred in the same jurisdiction." *Id.,* n. 2. The clear implication was that where "injury" and "place of wrong" are not the same (and as in the Tobacco cases, where venues are multiplied to the nth degree) the need for *Babcock* principles are even more pressing.

The *Babcock* opinion rejected the old vested rights theory in favor of "practical

considerations." *Id.* at 478, 240 N.Y.S.2d 743, 191 N.E.2d 279.

"The vice of vested rights theory," it has been amply stated, "is that it affects to decide concrete cases upon generalities which do not state the practical considerations involved". More particularly, as applied to torts, the theory ignores the interest which jurisdictions other than that where the tort occurred may have in resolution of particular issues.

*Id.* (citations omitted)

The court pointed out the "dissatisfaction with the mechanical formulae of the conflicts of law."*Id.* at 479, 240 N.Y.S.2d 743, 191 N.E.2d 279 (internal quotation marks omitted). "Center of gravity," "grouping of contacts," and "most significant contacts with the matter in dispute," are among the catch phrases used to describe New York's new pragmatic approach. *Id.*

The "center of gravity" or "grouping of contacts" doctrine adopted by this court in conflicts cases involving contracts impresses us as likewise affording the appropriate approach for accommodating the competing interests in tort cases with multi-State contacts. Justice, fairness, and the best practical result may best be achieved by giving controlling effect to the law of the jurisdiction which, because of its relationship or contact with the occurrence or the parties, has the greatest concern with the specific issue raised in the litigation. The merit of such a rule is that it gives to the place having the most interest in the problem paramount control over the legal issues arising out of a particular factual context and thereby allows the forum to apply the policy of the jurisdiction most intimately concerned with the outcome of the litigation.

*Id.* at 482, 240 N.Y.S.2d 743, 191 N.E.2d 279. (citations and internal quotations omitted.).

Finally, the Court of Appeals emphasized that not all issues of law must be resolved by reference to the law of the same jurisdiction.

In conclusion, then, there is no reason why all issues arising out of a tort claim must be resolved by reference to the law of the same jurisdiction. Where the issue involves standards of conduct, it is more than likely that it is the law of the place of the tort which will be controlling, but the disposition of other issues must turn, as does the issue of the standard of conduct itself, on the law of the jurisdiction which has the strongest interest in the resolution of the particular issue presented.

*Id.* at 484, 240 N.Y.S.2d 743, 191 N.E.2d 279.

In a series of subsequent cases the Court of Appeals refined the interest inquiry, fashioning guidelines for particular classes of commonly occurring cases "which give[ ] the greatest weight to those contacts which are relevant to the policies animating the particular rules in conflict." *Hamilton,* 47 F.Supp.2d at 336–338 (describing refinements). None of these categories created by the Court of Appeals includes the complex activity described in the instant case which is claimed to have given rise to hundreds of billions of dollars in damages to millions of potential plaintiffs from every state in the union.

Although the current post-*Babcock* Court of Appeals guidelines set forth a workable framework for analyzing many ordinary cases and traditional conflicts, they are not unyielding or comprehensive. They are most useful in those situations to which they apply as a "proxy for the ultimate question of which state has the greater interest in having its law applied." *See, e.g. Hamilton,* 47 F.Supp.2d at 337; *see also Neumeier v. Kuehner,* 31 N.Y.2d 121, 127, 335 N.Y.S.2d 64, 286 N.E.2d 454 (1972) (Babcock and its progeny "have helped us uncover the underlying values and policies which are operative in this area of the law … Now that these values and policies have been revealed, we may proceed to the next stage in the evolution

of law—the formation of *a few rules of general applicability*") (emphasis added); *see also Korn, The Choice of Law Revolution: A Critique,* 83 Colum.L.Rev. at 884 (noting Chief Judge Fuld's admonition that rules developed in *Neumeier* were a distillation of patterned cases applying interest analysis); *see also* Symeon C. Symeonides, *Choice of Law in American Courts in 1994: A View "From The Trenches",* 43 Am. J. Comp. L. 1, 12 (1995) (*Schultz* court did not return New York conflicts law to the traditional "last event necessary" test).

The New York Court of Appeals has never specifically addressed how conflicts rules apply in a complex litigation setting like the present one. Defendants direct the court to an intermediate appellate court and two trial court decisions which denied certification in global class actions purportedly due to substantial conflicts problems. *See, e.g., Ackerman v. Price Waterhouse,* 252 A.D.2d 179, 683 N.Y.S.2d 179, 189–190 (App.Div.1998); *see also Geiger v. American Tobacco Co.,* 181 Misc.2d 875, 696 N.Y.S.2d 345, 352 (Sup. Ct. Queens Cty.1999) (appeal pending); *Russo v. Massachusetts Mutual Life Ins. Co.,* 178 Misc.2d 772, 680 N.Y.S.2d 916, 919 (Sup.Ct. Tompkins Cty.1998). These cases relied upon by defendants do not, however, establish a general conflicts of laws category because the question of whether a particular action qualifies for class status under New York law is a matter of discretion exercised on a case-by-case basis by the Appellate Division involving many criteria in addition to choice of law. *See, e.g., Small v. Lorillard Tobacco Co.,* 94 N.Y.2d 43, 698 N.Y.S.2d 615, 720 N.E.2d 892 (1999) (examining relevant CPLR 901(a) class action factors, but deferring to Appellate Division's discretion to certify class); David D. Siegel, *New York Practice* § 142 (3rd ed. 2000–01 Supplement). These case-by-case lower court decisions do not purport to negate Court of Appeals choice of law principles.

The DES and *Hamilton v. Accu-Tek* decisions in this court are also non-controlling. Those cases involved trials of individual plaintiffs' claims. While these cases applied traditional conflicts rules, the result in each was consistent with the case specific needs and policies in adjudicating a non-class action. *See In re DES Cases,* 789 F.Supp. 552, 566–570 (1992) ("Such a result also comports with the practicalities of mass tort cases. To the fullest possible extent, such cases should be *consolidated* for pretrial discovery and motions, settlement discussions and trial; administered by one or a few judges; and tried under one set of substantive and procedural rules applicable to all consolidated cases.") (emphasis added); *see also Hamilton v. Accu-Tek,* 47 F.Supp.2d at 340 ("The points of distribution involved many states and vary from company to company; if the significant contact were the point of distribution, so many states' laws would be involved that *consolidation* of defendants would be impractical.") (emphasis added).

In two related cases, *Falise v. American Tobacco Co.* and *Bergeron v. Philip Morris,* it was held that the national and worldwide scope of Tobacco's alleged deceptive conduct and false advertising requires re-examining choice of law guidelines heretofore applied in more limited disputes. *See Falise,* 94 F.Supp.2d 316, 353–354 (2000); *accord Bergeron,* 100 F.Supp.2d at 170; *see also* Patrick J. Borchers, *Choice Of Law in American Courts in 1992: Observations and Reflections,* 42 Am. J. Comp. L. 125, 141 (1994) ("Mass torts have presented some of the most difficult problems for interest analysis and variants thereof"). In the present controversy the court is impelled to return to the bedrock principle in *Babcock*—that controlling effect should "be given to the law of the jurisdiction which has the greatest interest in the specific issues raised in the litigation." *See Bergeron, supra,* at 169.

Before evaluating constitutional and interest analysis requirements, examination of the New York Court of Appeals refinements of *Babcock,* the history of their ap-

plication in mass torts cases, the general history of conflicts law, and current scholarship and precedent in complex litigation demonstrates why founding principles in *Babcock* requires a hand-tailored application of that case's principle to a tort class action of the magnitude and scope of the Tobacco litigation.

### 2. *Refinements to Babcock*

After Babcock a distinction was drawn between laws that regulate primary conduct (such as standards of care) and those that allocate losses after the tort occurs (such as guest statutes or vicarious liability rules). *See Cooney v. Osgood Machinery, Inc.*, 81 N.Y.2d 66, 72, 595 N.Y.S.2d 919, 612 N.E.2d 277 (1993). If conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort "occurred" will generally apply because that jurisdiction usually has the greatest interest in regulating behavior within its borders. *Id.* Conduct-regulating rules have the supposed prophylactic effect of influencing conduct to prevent injuries from occurring. *Hamilton*, 47 F.Supp.2d at 336; *see also Padula*, 84 N.Y.2d 519, 521, 620 N.Y.S.2d 310, 644 N.E.2d 1001 (1994). If competing "post event remedial rules" are at stake other factors are considered. *Schultz v. Boy Scouts*, 65 N.Y.2d 189, 195, 197–199, 491 N.Y.S.2d 90, 480 N.E.2d 679 (1985) ("analysis ... flexible"; "relative interest of ... jurisdictions in having their laws apply will depend on the particular tort issue in conflict in the case"); *see Hamilton*, 47 F.Supp.2d at 336–337 (describing different rules under *Neumeier* depending on domicile and place of injury). Because this action largely implicates conduct regulating laws (e.g., fraud and consumer protection), a court would ordinarily consider where the tort "occurred" in deciding which forum has the greatest interest in applying its laws.

However, multi-state transactions are more complex when the defendant's tortious conduct and the plaintiff's injury occur in different states. *See* Symeon C. Symeonides, *Choice of Law in American Courts in 1994: A View "From The Trenches"*, 43 Am. J. Comp. L. 1, 12 (1995) (describing the inapplicability of the *Neumeier* rules when conduct and injury occur in separate states); *see also Rice v. Nova Biomedical Corp.*, 38 F.3d 909, 916 (7th Cir.1994) ("[T]he place of the wrongful conduct and the place of the injury are treated as separate contacts between the lawsuit and the states in question. As a result, when the places are different, the presumption that the law of the place of 'the tort' applies cannot be used; the tort has no place; instead it has contacts, presumably offsetting, with at least two states. If defamatory statements are uttered in Massachusetts and the plaintiff is hurt in Illinois, neither state is the place of the tort.") (citations omitted); *Korn, The Choice of Law Revolution, supra*, at 805–806 (recounting how the *lex loci delicti* rule historically did not work well in "tort actions outside the personal injury field—such as defamation, unfair competition, or misrepresentation—in which it is often difficult to identify a single place of injury").

*Schultz* has sometimes been incorrectly cited for the narrow proposition that the "place of the wrong" is always where the "last event necessary to make the actor liable occurred." *Schultz*, 65 N.Y.2d at 195, 491 N.Y.S.2d 90, 480 N.E.2d 679. For actions sounding in fraud and deceit, the substantive law of the state in which the injury is suffered, rather than the state where the fraudulent conduct was initiated, often governs. *See, e.g., Sack v. Low*, 478 F.2d 360, 365 (2d Cir.1973) ("[W]hen a person sustains loss by fraud, the place of wrong is where the loss is sustained, not where fraudulent representations are made."); *Sound Video Unlimited v. Video Shack Inc.*, 700 F.Supp. 127, 134 (S.D.N.Y.1988) (in fraud and related actions, the last event necessary is where the loss is suffered); *Natural Resources Corp. v. Royal Resources Corp.*, 427 F.Supp. 880, 882 (S.D.N.Y.1977) ("Such a claim has been said to arise where plain-

tiffs' pocketbooks are situated"). This simple "last place" criterion is not chiseled in stone, but rather gives way when it is at war with state interests so that the more general *Babcock* principle applies.

First, a careful reading of *Schultz* indicates that the "last event necessary test" does not displace New York interest analysis. In *Schultz*, the Court of Appeals still evaluated contacts which were relevant to the policies animating the conflicting rules at issue. *Schultz*, 65 N.Y.2d at 200, 491 N.Y.S.2d 90, 480 N.E.2d 679 (considering impact of applying forum law on New York medical creditors, estimating chances tort victims would become public wards, and weighing deterrent effect on future tortfeasors); *see also Osgood*, 81 N.Y.2d at 78 n. 3, 595 N.Y.S.2d 919, 612 N.E.2d 277 ("we have eschewed reliance on the fictional expectation of the parties based on mere contact with the locus of an accident, but reasonable, justifiable expectations [of the parties] are another matter") (citations omitted).

Second, the refinements expressed in the *Neumeier* rules, and in *Schultz*, were designed for simple fact scenarios. When applied to cases involving mass delicts—with many plaintiffs, complex causation questions, and transitory goods—rules designed for one-on-one disputes may require modification.

Third, complex cases nominally applying the "last event necessary test" do not strictly abide by that rule. In cases like products liability and airplane crashes, New York federal courts properly use some form of *Babcock* "interest" analysis. *See, e.g., Pescatore v. Pan American World Airways, Inc.* 97 F.3d 1, 12 (2d Cir.1996) (displacing traditional rule when explosion occurred over Scotland, but "causative misconduct" occurred in either Frankfurt or London); *Champlain Enterprises, Inc. v. U.S.*, 945 F.Supp. 468, 473–474 (N.D.N.Y.1996) (noting in products liability cases involving airplanes or automobile tires, courts consider transitory nature of product in displacing traditional rule);

*Campbell v. Goodyear*, 1985 WL 1514 (S.D.N.Y.1985) (multi-state products liability cases involving mobile products present extraordinary circumstances that defeat application of traditional rule).

### a. *Schultz*

Because most of the rules developed by the New York Court of Appeals were devised for guest statute conflicts, they involved relatively simple, localized facts—like automobile accidents—and a stark choice between competing rules. In 1985, the Court of Appeals officially extended these rules to conflicts between loss-distribution laws other than guest statutes. *Schultz*, 65 N.Y.2d at 199, 491 N.Y.S.2d 90, 480 N.E.2d 679. In *Schultz*, a scoutmaster at a New York summer retreat allegedly molested two boys from New Jersey, and subsequently threatened them at their homes. After one of the boys committed suicide in New Jersey, the parents brought a wrongful death action in New York. At issue was whether New Jersey's charitable immunity statute would bar the action.

Without applying this rule directly to the facts, the Court of Appeals acknowledged that in cases where the alleged conduct and injury occur in different states, "under traditional rules, the place of the wrong is considered to be the place where the last event necessary to make the actor liable occurred." *Schultz*, 65 N.Y.2d. at 194, 491 N.Y.S.2d 90, 480 N.E.2d 679. Although this language would seem to mark a return to the vested rights analysis of the First Restatement, the Court of Appeals did not rely upon a mere recitation of the traditional rule. *See AroChem International, Inc. v. Buirkle*, 968 F.2d 266, 271 (2d.Cir.1992) (plaintiffs' strict reliance on "last necessary event" test misplaced). The Court of Appeals insisted upon evaluating contacts which were relevant to the policies and interests animating the conflicting rules at issue:

> The first and fourth causes of action, the wrongful death of Christopher and plaintiff's own psychological and other

injuries respectively, allege injuries inflicted in New Jersey. New York's only interest in these claims are as the forum state, and as the jurisdiction where the tortious conduct underlying plaintiffs claims, the negligent assignment and failure to dismiss Coakeley occurred. Standing alone, these interests are insufficient to warrant application of New York law, at least when the relevant issue is a loss-distribution rule, rather than one regulating conduct. (citations omitted).

*Schultz,* 65 N.Y.2d. at 195, 491 N.Y.S.2d 90, 480 N.E.2d 679.

The *Schultz* court could simply have relied on the "last event necessary to make the actor liable" to pin-point the locus of the tort. Instead, the court moved directly into interest analysis-isolating the kinds of contacts alleged in the complaint and their bearing on each respective state. *See* Symeon C. Symeonides, *Choice of Law in American Courts in 1994: A View "From The Trenches",* 43 Am. J. Comp. L. 1, 12 (1995). Although the application of charitable immunity to the defendants in *Schultz* has been seriously questioned, the court's flexibility in determining the appropriate law suggests that in deciding a mass torts case such as the instant one it would have a pragmatic mind. *See, e.g.,* Louise Weinberg, *Symposium: Preparing For The Next Century—A New Restatement of Conflicts A Structural Revision of the Conflicts Restatement,* 75 Indiana Law Journal 475 (2000) (approving of interest analysis, but describing the ultimate outcome in *Schultz* as "notoriously wrong"); *see, e.g.,* Butkera v. Hudson River Sloop "Clearwater," Inc., 300 N.J.Super. 550, 693 A.2d 520 (1997) (employing interest analysis to similar facts as *Schultz,* but reaching opposite result).

The court of appeals for the Second Circuit followed New York's pragmatic and flexible analysis in *AroChem International, Inc. v. Buirkle. See AroChem International,* 968 F.2d at 271. It ruled that Connecticut was not the "locus state" even though it was the state where the injury resulting from defamation occurred. It found the plaintiff's reliance on the "last event necessary test" misplaced because *Schultz* ultimately relied on interest analysis. *Id.* Characterizing California's law as conduct-regulating, the court of appeals concluded that "even assuming that injuries suffered by Harris and AroChem occurred in Connecticut, California interests prevail." *Id.*

The Court of Appeals's detailed but limited *Neumeier* rules are inappropriate in the instant case. *See Neumeier,* 31 N.Y.2d at 128, 286 N.E.2d at 458, 335 N.Y.S.2d at 70 (quoting *Tooker v. Lopez,* 24 N.Y.2d 569, 585, 249 N.E.2d 394, 404, 301 N.Y.S.2d 519, 533 (1969) (Fuld, C.J., concurring)); *see also Hamilton,* 47 F.Supp.2d. at 336–337 (describing the three rules under *Neumeier* depending on parties domicile and place of injury); Symeonides, *Choice of Law in American Courts in 1994: A View From the Trenches,* 43 Am. J. Comp. L. 1, 12 (1994).

Because the *Neumeier* rules originally were devised for guest statute conflicts, and because in each rule the driver's conduct and the place of the resulting injury coincide in the same state, they fail to control when there is a conflict between the place of conduct and the place of resulting injury. *See* Symeonides, *Choice of Law in American Courts in 1994: A View From the Trenches,* 43 Am. J. Comp. L. at 12 ("Thus, when Neumeier rule 2a speaks of the 'driver's conduct' it presupposes that any injury which is caused by such conduct also will occur in the state of that conduct. Likewise, when rule 2b speaks of a 'guest' being injured in the state of his own domicile, it assumes ... the conduct ... must also have occurred in the same state"). Dispersal difficulties in the mass Tobacco cases underscore the conclusion that New York rules generally applicable to single tort situations do not control a case as complex as the present one; *Babcock* principles do.

### b. Cases Involving Mass Disasters

The most difficult choice of law problems occur when mass torts plaintiffs from many jurisdictions sue a number of defendants, all of whom have different contacts with the forum state. This problem usually occurs in two contexts. The first is the mass disaster at a single location, such as the crash of a commercial airplane. Hundreds of claimants from dozens of states and countries may sue the airline, manufacturers, and other defendants. Traditional choice of law rules could theoretically simplify the analysis, applying the law of the place of the injury or the place of "causative misconduct."

The second form of the problem is even more difficult for the traditional *lex loci delicti* approach: Many plaintiffs are injured by a defective product or products in many locations (and the products' producers may be operating from many places). Rule 23 is viable in such mass tort cases, but requires "caution when individual stakes are high and disparities among class members are great." *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 625, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). The question is whether traditional or modern conflicts of law methods apply to these massive cases under New York choice of law rules so as to make possible an aggregation of claims in a class action and timely disposition without overburdening the courts.

Although they are not conclusive on these questions, New York mass disaster cases—particularly those involving complex questions of causation and transitory goods—rely upon interest analysis. In airplane crashes and products liability cases, even courts claiming to apply rigid rules do not strictly abide by them, but ultimately turn their decisions on some evaluation of the theoretical and practical aspects of the jurisdictions' interests in the action.

### i. Airplane Crashes

In *Pescatore v. Pan American World Airways, Inc.,* the court of appeals for the Second Circuit analyzed the applicability of an Ohio "loss of society" damage rule to an aircraft explosion over Lockerbie, Scotland. *Pescatore v. Pan American World Airways, Inc.,* 97 F.3d 1, 12 (2d Cir.1996). It first stated that the law where the accident occurred would "presumptively apply," since the injured party and defendant resided in different jurisdictions, and the accident occurred in a third jurisdiction. *Pescatore,* 97 F.3d at 13 (*citing Neumeier,* 31 N.Y.2d at 128, 335 N.Y.S.2d 64, 286 N.E.2d 454). After discussing the principles underlying *Babcock* and the limited concern Scotland might have in imposing loss-allocating rules to aircraft passengers, the court departed from the "last event necessary" test. *Pescatore,* 97 F.3d at 14. It gave diminished significance to this mechanical approach, suggesting that the causal chain leading up to the explosion limited Scotland's interest in claims by injured passengers:

> Although the explosion occurred over Scotland, the *causative misconduct* occurred in Frankfurt (where the bomb eluded Pan Am's X-ray inspection and was placed on Flight 103), or in London (where Pan Am failed to remove or inspect the unaccompanied bag that carried the bomb). Under these circumstances, where no negligence or misconduct took place in Scotland, and where no damages [to the persons claiming through airline passengers] were incurred in Scotland, there is really no reason at all why the compensability of the plaintiff's damages should be governed by Scottish law.

*Id.* (emphasis and citations omitted)

*Champlain Enterprises v. U.S.,* 945 F.Supp. 468 (N.D.N.Y.1996), took the *Pescatore* analysis a step further, applying Kansas law to a New York air crash, when the aircraft was defectively manufactured in Kansas. The court relied upon the analysis in *Pescatore* to find the tort oc-

curred *in Kansas* because the manufacturing plant was the site of causative misconduct. The court reasoned that Kansas had the greater interest in a negligence dispute because "that state has a large stake in governing the liability of manufacturers within its borders." *Champlain,* 945 F.Supp. at 473–474.

Two conclusions can be drawn from these cases. First, even in single event disasters, New York choice of law does not automatically look to the *lex loci delicti.* Although in cases of mixed domicile, New York generally applies the law where the injury occurred, the court of appeals in *Pescatore* demonstrated that the site of causative misconduct also may be relevant to this inquiry. Had the causative misconduct occurred in Scotland, rather than in Frankfurt or London, Scotland would have been the "locus of the tort" and may have had enough of an interest in the action to have its law applied in a New York suit by an Ohio resident. The fact that the causative misconduct occurred elsewhere led the court to elide the "last necessary event" test, and return to a form of interest balancing, as in *AroChem.* *Compare Pescatore v. Pan American World Airways, Inc.,* 97 F.3d at 14 *with AroChem International v. Buirkle,* 968 F.2d at 271. It assumed that either the domiciliary of the defendant (New York) or of the plaintiff (Ohio) would have the most significant interests in applying their respective wrongful death statutes.

Second, assessing causative misconduct is an important component of interest inquiry involving conduct regulation. In *Champlain,* the court used evidence of causative misconduct in Kansas to find that Kansas, and not New York (where the airline crashed) was the "locus of the tort." A number of commentators have suggested that place of the conduct (when injury occurs in a different state) has a greater bearing in determining what law to apply. *See, e.g.,* Thomas E. Willging, *Mass Torts Problems and Proposals,* Federal Judicial Center 97 (January 1999) ("In mass torts

settings, the only jurisdiction with an interest that could be recognized as applicable to a group of plaintiffs from multiple states will be the law of the place of conduct"); *see also* Robert A. Sedler, *The Complex Litigation Project's Proposal for Federally–Mandated Choice of Law in Mass Torts: Another Assault on State Sovereignty,* 54 La. L.Rev. 1085, 1100–1102 (1994); *American Law Institute: Complex Litigation: Statutory Recommendations And Analysis* § 6.01(d)(4) ("In all other cases, the law of the state where the conduct causing the injury occurred governs").

### ii. *Products liability*

In the products liability line of conflicts cases, causative misconduct plays a strong role in pinpointing what law to apply when transitory goods hurt people. *See Hadar v. Concordia Yacht Builders,* 886 F.Supp. 1082, 1094 (S.D.N.Y.1995); *Carlenstolpe v. Merck & Co.,* 638 F.Supp. 901, 910 (S.D.N.Y.1986). The fact patterns in these cases represent typical problems modern mass torts pose for conflicts law. Generally, the goods pass through, and are constructed in multiple jurisdictions. Moreover, plaintiffs and defendants hail from different states or countries—ultimately requiring modification of boundary restrictions on choice of law.

*Carlenstolpe* involved a suit brought by a Swedish opera singer against a New Jersey based drug manufacturer alleging that a hepatitis vaccine, HB–Vax, gave her disabling arthritis. *See Carlenstolpe,* 638 F.Supp. at 901. The defendant, self described as a "worldwide organization engaged primarily in the business of discovering, developing, producing and marketing human and animal health products," was a New Jersey corporation which developed and produced HB Vax through a Pennsylvania based subsidiary. In deciding to apply Pennsylvania law, the court followed an analysis calling for a departure from *lex loci* principles.

62

Under New York law, in a situation where the place of the alleged wrongful behavior and the place of the injury are different, the place of the wrong is defined as the place of the injury. Thus, in the present case, strictly speaking, the place of the wrong is Sweden, where the plaintiff was injured, while Pennsylvania is merely the place of the tortious act. The underlying New York state rationale, however, as articulated in *Schultz*, for applying the law of the place of the tort where conduct regulating rules are concerned, mandate that Pennsylvania and not Swedish law apply here.

*Id.* at 910 (citations omitted.).

The *Schultz* rationale, the court reasoned, derived from the interest of the "locus jurisdiction . . . in protecting the reasonable expectations" of the parties who relied on its law to govern their conduct. *Id.* This "fundamental rationale" respecting a jurisdiction's interest in affecting behavior applied to the place of the wrong—that is, where the "defendant's allegedly wrongful behavior has occurred rather than the place of injury." *Id.* Under this interest analysis, Pennsylvania law—the site of development and manufacture of the vaccine-controlled.

In *Hadar*, the purchaser of a yacht sued defendant when two incompatible substances, epoxy resin and peel ply, were applied to the deck, causing delamination. *See Hadar*, 886 F.Supp. at 1086–87. The epoxy resin was manufactured in Washington state and the peel ply in North Carolina; the substances were combined in Massachusetts; the plaintiff and yacht were in New York; the defendants were in Massachusetts, New Hampshire, Rhode Island, and North Carolina. *Id.* at 1093. The yacht was delivered to the plaintiff in New York in May 1989; but late in the summer of 1990, in New York, he noticed a "print through" of the hull, and had the boat repainted. *Id.* at 1087. In 1990, the plaintiff in New York noticed another flaw, which he characterized as delamination.

The court announced that there were no "extraordinary" circumstances demanding a departure from the traditional rule. *Id.* at 1093–1094. It stated that is was applying the *lex loci delicti.* Yet, it recognized that a products liability case involving mobile products may pose extraordinary circumstances, requiring application of the place of manufacture—as in *Carlenstolpe.* *Id.* Like the air-crash cases before it, the court did not apply the law of the site of the injury—which in this case would presumably have been New York. Instead, the court seemed to apply the law where the causative misconduct took place, that is where the two products were combined-in Massachusetts. *Id.* The court reasoned—without explicitly departing from traditional analysis—that Massachusetts had a greater interest than the states of manufacture of the individual products in the safety of this combined product. Massachusetts was the site where the elements were combined and also the residence of two of the defendants. It should be noted that Massachusetts might have been characterized as the place of "manufacture" of a deleterious product by combining elements made elsewhere.

*Babcock* remains the backdrop of New York conflicts jurisprudence—binding on this court under *Klaxon*—when specific rules fail to accommodate modern case realities. The use of goods shipped and marketed interstate, and the possibility of extraterritorial causative misconduct, diminishes the utility of traditional emphasis courts have placed on the "place of injury" when determining the locus of a simple tort.

### 3. *History*

A rule applying New York liability law in the instant case, rather than the laws of all the states individually to people injured all over the country finds support in the history of conflicts law. The past has yielded a rich accumulation of ideas, which informs present theory and practice in New York and elsewhere. W. Reese, et

al., *Cases and Materials on the Conflict of Laws* 3 (9th ed.1990). Conflicts cases arise because law making bodies of various jurisdictions see the world differently; if the law were uniform in all jurisdictions there would be no conflict. Two salient concerns undergird conflicts analysis— concepts of sovereignty (how to respect policy determinations of different jurisdictions) and fairness (how to decide cases in ways that make good sense and do not violate the parties' ability to prosecute and defend the action effectively). Touching briefly on how changing notions of sovereignty and fairness have affected choice of law decisions illustrates why applying New York law to some, but not all, issues in the instant case is both consistent with past approaches and appropriate.

### a. *Antiquity*

What has long been sought is a lingua franca of the law that permits the courts of different states to respect each other's persons and policies, while fairly and effectively resolving private disputes. Always there is the hovering Tower of Babel spectre. *See Genesis* 11:2–9. As Professor Juenger and his colleagues have demonstrated, a perfect formula for transmuting legal diversity into equivalence continues to elude both savants and practitioners. *See, e.g.,* Friedrich Juenger, *Choice of Law and Multistate Justice* (1993).

As early as fourth century B.C.E., when Greek city states were in their prime and trade was active in the eastern Mediterranean, a "private international law" emerged. *Id.* Rather than choose between different jurisdictional laws of individual city states, Greek courts usually applied the *lex fori* (law of the forum). *Id* at 7. Nevertheless, the Greek system concurrently was able to develop a body of common law that rested on shared principles and common custom. *Id.* Choice of law issues were in part alleviated because the Greeks gave greater weight to fairness concerns than to the sovereignty of the individual states. *Id.* at 7–8. In addition, treaties between city states created substantive rules applicable to disputes between citizens. Some cases, because of their inherent international scope, warranted the application of a single set of principles. As an Athenian speaker once asked rhetorically, "Are not the laws of justice concerning mercantile cases the same for all of us?" *Id.* at 7.

Like the Greeks, the Romans never developed a formal system of choice of law rules. As Roman merchants traveled abroad and foreigners did business in Rome, overly formalistic local laws became too burdensome for the changing times. Special *praetors* were empowered to deal with litigation involving non-citizens. Relying on informed legal intuition, Greek legal principles and the notion of *bona fides,* the *praetor* created a body of norms, a *ius gentium,* more flexible and functional than local civil law. Id. at 8–10.

In summary, the Greeks and Romans approached legal issues posed as a result of international travel, trade and contracts similarly. Instead of relying entirely on the differing laws of various jurisdictions, they created a body of law that accorded judges freedom to find fair solutions that, although local in origin, were international in import. When balancing between sovereignty interests in applying local law and producing just outcomes, Greece and Rome arguably placed more emphasis on fairness by developing a body of flexible principles governed by specialized judges. *See* Symeon C. Symeonides, *Private International Law at the End of the 20th Century: Progress or Regress?,* General Report, XVth International Congress of Comparative Law, Bristol, England (1998) ("Thus, the first instinct of the legal mind when confronted with multi-state private law dispute was one of compromise, rather than choice, ecclecticism rather than all or nothing, 'material justice' rather than 'conflicts justice'"). In a sense, Roman world suzerainty has now been supplanted by a single integrated global world of interrelated private production and consumption,

suggesting the need for an approach not unlike that of the ancients. *Cf.* Graeme B. Dinwoodie, A New Copyright Order: Why Material Courts Should Create Global Norms, 149 U. Pa. L.Rev. 469, 557 (2000) (conflicts principles and other techniques to achieve global norms).

### b. *Middle Ages*

The beginning of conflicts of laws, as we know it, may be traced to the twelfth century. *See generally* Friedrich Juenger, *The Need For a Comparative Approach To Choice of Law Analysis,* 73 Tul.L.Rev. 1309, 1319 (1999). The political realities of Upper Italy, where these efforts began, explain scholastic interest in the subject. Italian city states cherished their sovereignty and independence, each having its own judiciary and local laws. Living in medieval university towns, scholastics were acutely aware of the political importance of local government and inevitably directed their attention to the problem of whether a local statute could and should be applied to foreign based facts. The concept that multistate problems required a choice between competing laws marked a departure from Roman *ius gentium.* Although originally some scholars suggested a solution similar to general Roman principles—by applying the fairest and most useful law—many tackled the problem in a conceptualist, rather than a results-oriented fashion. Instead of looking for substantive solutions, academics and jurists emphasized territoriality—the personal link between a state and its citizens. Accordingly, they discussed whether local statutes could be applied to citizens abroad, or whether foreign citizens within the region were bound by local laws. This "unilateral" approach focused directly on the content of conflicting state laws and tried to delineate spheres of operation on the basis of underlying legislative intent. *See* Friedrich Juenger, *Choice of Law And Multistate Justice* 14–15 (1993).

### c. *English Law*

England's conflicts laws have been deemed by some to reflect an arrested development. *See generally id.* at 22. The centralization of power in the King and the establishment of a common law limited conflicting laws inside the country once medieval courts were curtailed. *See, e.g.,* Julius Goebel, Jr., *Cases and Materials on the Development of Legal Institutions* 131 (7th.Ed.1946). Early principles of venue kept international conflicts cases out of the courts, largely because trial required a jury of the vicinage. In time, English courts developed an interesting form of *lex fori.* It applied its own law to foreign disputes by adopting legal fictions. Courts simply would assume that foreign acts occurred in England. *See* Friedrich Juenger, *Choice of Law and Multistate Justice, supra* at 22 (citing *Ward's Case,* 82 Eng. Rep. 245, 246 (K.B.1625) ("[W]e shall take it that Hamburg is in London in order to maintain the action which otherwise would be outside our jurisdiction. And while we know the date to be at Hamburg beyond the sea, as judges we do not take notice that it is beyond the sea.")). Because the common law was generally unsuited to cope with international transactions, special courts, as in Greece and Rome, were granted jurisdiction to deal with maritime and commercial cases. These courts applied a common European *lex mercatoria;* here, judges, like the *praetors,* drew on sources scattered over time and space—such as the ancient sea law of Rhodes or the *Consolat de Mar. Id.* at 23–24. Thus, England was an odd blend of both sovereign specific and fairness specific conflicts laws. Id. at 24–27.

### d. *The Nineteenth Century and Early American Conflicts Law*

The United States presents special problems because every state is a nation for purposes of choice of law analysis, but it is also a part of a unified social, commercial and technological system. A some-

what uniform common law ameliorated the potential for many conflicts.

In the nineteenth century, "statutist" and forum centered approaches were displaced by multi-lateralist choice of law rules that still animate our conflicts law. *See* Friedrich K. Juenger, *How Do You Rate A Century?*, 37 Willamette L.Rev. 89, 91 (2000). The leading principles of this new school were expressed in the writings of Friedrich Carl von Savigny in Germany and the scholarly commentaries of Justice Story. *See generally* Friedrich Juenger, *The Need For a Comparative Approach To Choice of Law Analysis*, 73 Tul.L.Rev. 1309, 1319–1321 (1999). Rather than focusing on the conflicting laws and attempting to ascertain their spatial reach, Savigny focused on categories of disputes—like torts or contracts—and then sought to identify the state in which each relationship had its "seat" or in which legislative jurisdiction it "belonged." Id. at 1317. The result of this approach, and the efforts of Justice Story here in the United States, placed foreign law on par with forum law regardless of whether a state had expressed a "wish" to apply its law and regardless of the law's content. Symeon C. Symeonides, *Reflections on American Choice of Law at the Dawn of the 21st Century*, 37 Willamette L.Rev. 1, 18–19 (2000).

Although increasing industrialization and mass transit networks raised the potential for interstate disputes, some states were fairly closed and insular in attitude and outlook. *See generally* Harold P. Southerland, *Sovereignty, Value Judgments, and Choice of Law*, 38 Brandeis L.J. 451, 465 (2000). The civil war still lived on in memory, serving as a reminder of the economic and cultural differences between the states. Story's framework for multilateral "comity" and von Savigny's concepts of "decisional harmony" fit well with the developing American mind-set that placed increasing importance on state sovereignty, and equated fair results with neutral and predictable outcomes among states. *Cf.* Harold L. Korn, *The Development of Judicial Jurisdiction in the United States: Part I*, 65 Brooklyn L.Rev. 935, 937–953 (1999) (jurisdiction based on sovereignty limits were established in the nineteenth century, but are under increasing stress in the twenty-first). *But see* William S. Dodge, *Extraterritoriality and Conflict of Laws Theory: An Argument for Judicial Unilateralism*, 39 Harv. Int'l L.J. 101 (1998) (application of federal statutes to international transactions in antitrust matters); *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 444 (2d.Cir.1945).

The basic approach to conflicts law in the United States paralleled European developments well into the twentieth century. Symeon C. Symeonides, *Reflections on American Choice of Law at the Dawn of the 21st Century*, 37 Willamette L.Rev. at 18–19. At least in theory, foreign law was considered to have the same claim to application as local law. Whether one or the other controlled depended on neutral, objective criteria that paid no attention to the content of substantive rules. The primary goal was to preserve comity and prevent forum shopping by ensuring that the same rules of decision governed a given legal transaction, wherever it was litigated. *See generally* Friedrich Juenger, *Choice of Law and Multistate Justice*, *supra* at 29–47. This approach was enshrined in the 1934 *First Restatement of Conflicts*, which advocated hard and fast choice of law rules "premised on the principle that the last event necessary to create or change a legal relationship determines where a right vests." 2 J. Beale, *A Treatise on the Conflict of Laws* 1288 (1935) ("It is impossible for a plaintiff to recover in tort unless he has been given by some law a cause of action in tort; and this cause of action can be given only by the law of the place where the tort was committed. That is the place where the injurious event occurs, and its law is the law therefore which applies to it.").

e. *Current Choice of Law Theory in the United States*

The vested rights theory was criticized for its inflexibility. *See generally* Korn, *The Choice of Law Revolution: A Critique*, 83 Colum.L.Rev. 773 (1983); *see also* Harold P. Southerland, *Sovereignty, Value Judgments, and Choice of Law, supra*, at 470–471 (failure was not so much the First Restatements theory as much as notions of fairness and sovereignty themselves). The Great Depression, combined with two World Wars, brought increased power to our central government. Pressing problems of the "era were national in scope." Harold P. Sutherland, *Sovereignty, Value Judgments, and Choice of Law, supra*, at 472. Industrialization, the electrification of the nation, the mass production of goods and their marketing and advertising on a national scale, telephones, radios, wire services, and the automobile made the nation seem smaller and more closely knit. *Compare Pennoyer v. Neff*, 95 U.S. 714, 24 L.Ed. 565 (1877) *with Hess v. Pawloski*, 274 U.S. 352, 47 S.Ct. 632, 71 L.Ed. 1091 (1927) (sustaining the constitutionality of a substituted service statute designed to cope with automobile accidents by out of state defendants); *see also* Harold L. Korn, *The Development of Judicial Jurisdiction in the United States: Part I*, 65 Brooklyn L.Rev. at 938–947. This development corresponded with a much diminished sense of the importance of state lines that divided people. · In the more mobile twentieth century courts asked themselves whether the results dictated by the inflexible rules of state territoriality retained their past attraction. *See, e.g.*, Part III A 1, *supra; see also Babcock v. Jackson*, 12 N.Y.2d at 481, 240 N.Y.S.2d 743, 191 N.E.2d 279 ("First, by one rationale or another, they rejected the inexorable application of the law of the place of the tort where that place has no reasonable or relevant interest in the particular issue involved. And, second, in each of these cases the courts, after examining the particular circumstances presented, applied the law of some jurisdiction other than the place of the tort because it had a more compelling interest in the application of its law to the legal issue involved.").

Disillusion with a traditional mechanical framework produced innovative exceptions. A tort action might be "characterized as one in contract; an issue usually thought as substantive might be labeled procedural," and the public policy exception was increasingly used to justify denying enforcement of another state's law. *See* Harold P. Southerland, *Sovereignty, Value Judgments, and Choice of Law, supra*, at · 471. The "Twentieth Century was a dangerous place, and the decisions began to reflect a realistic appraisal of what it meant to live in a highly industrialized and technologically advanced society." Id. at 473–474. Most of the escape devices were applied when suits were brought in states favoring recovery, both the plaintiff and defendant were residents of the state, and when the place of injury was essentially fortuitous. Id. at 478. The discontent was most evident in the area of personal injury. But perhaps of even greater significance was the fact that the combination of factors suggested that the sovereign interests of a particular state might be less important than reaching a fair and just result.

These developments in turn led to the already described *Babcock* revolution in New York, and through the United States. *See* Part III A 1 & 2, *supra*. Most current approaches underscore two basic premises of interest analysis: 1) the notion that states have an interest in the outcome of multi-state private law disputes, and 2) that these interests should be taken into account, together with other factors, in resolving these conflicts. Symon Symeonides, *Reflections on American Choice of Law at the dawn of The 21st Century, supra*, at 21.

In some ways, as this brief and necessarily superficial historical overview illustrates, current changes mark a return to principles of flexibility and policy evaluations that date back to antiquity. In par-

ticular, three basic historical trends are pertinent to the case at hand: 1) notions of individual justice have trumped sovereign interests in affairs that by their nature havè a supranational scope; 2) the unique nature of some cases demand flexibility and comparison of alternative results achieved by applying different laws; and 3) the changing forms of personal injury in the twentieth century, due to increased mobility of goods, people, and information, may impose strong pressures on conflicts norms, and demand a return to interest based solutions in some cases.

The history of American and European conflict systems reflect a continuing struggle to obtain equilibrium between certainty and flexibility. Even Professor Beale, who drafted the original Restatement, admitted this sometimes cyclical movement of conflicts law:

> The whole history ... of law is the history of alternate efforts to render the law more certain and to render it more flexible ... [T]o a period of strict law, where the one purpose of the law is to secure exactness and certainty, succeeds a period of equity and natural law in which the purpose is to infuse law with an element of justice and morality and therefore to temper the exactness of the strict law with a flexibility that may enable it to perform its function more justly. This in turn is succeeded by a period of maturity in which the flexibility of the period of equity and natural law is to a degree restrained by legalizing the broadness of equitable relief and bringing that too under precepts consisting of standards and principles so as to make it more certain ... This in turn is followed by a period in which again the free administration of law is emphasized; a period in which we now live, where the rules and principles of law cause impatience if too fixed in their application and a desire exists to individualize their operation.

Joseph H Beale, 1 *A Treatise on the Conflict of Laws*, 50 (1935).

### 4. Scholarship, Comparative Statutory Law, and Precedent in Complex Litigation

Recent scholarship and precedent suggests that the wheel has turned to a "period of equity and natural law" with regard to modern, complex tort problems. Most modern scholarship concludes that choice of law rules can, and should, lead to the application of either a few state laws, a single state law, federal common law, national consensus law, or abandoning *Klaxon* analysis altogether in complex litigation. *See, e.g.,* Ryan Patrick Phair, *Resolving the Choice of Law Problem in Rule 23(b)(3) Nationwide Class Actions*, 67 U. Chi. L.Rev. 835 (2000) (advancing the viability of a limited number of subclasses or application of a single state law); Larry Kramer, *Choice of Law in Complex Litigation*, 71 N.Y.U. L.Rev. 547 (1996) (while acknowledging that most scholars prefer one law, proposing manageable subclasses among small groups of differing state laws); Mary J. Davis, *Toward a Proper Role For Mass Tort Class Actions*, 77 Or. L.Rev. 157 (1998) ("A thoughtful reasoned analysis of a class action involving claimants from all states could legitimately result in applying the law of the defendant's home state to determine liability for conduct-based claims such as fraudulent misrepresentation or negligence"); James A.R. Nafziger, *Choice of Law in Air Disaster Cases: Complex Litigation Rules and the Common Law*, 54 La. L.Rev. 1001, 1013 (1994) (forum shopping concerns have created consensus in favor of applying the same body of rules to govern all issues in a single case); American Law Institute, *Complex Litigation Project* § 6.01 comment a, at 398–399 (desirability of applying law of single state to particular issue that is common to all claims); Friedrich K. Juenger, *Mass Disasters and the Conflict of Laws*, 1989 U.Ill. L.Rev. 105, 126 (in choosing the applicable rule for any issue in mass disaster case, it is preferable to frame an alternative reference posi-

tion that favors application of the better substantive rule that can be expected to produce decision-making rules similar to national consensus law).

While some scholars reject flexible and nuanced solutions for new problems, the commentary regarding complex litigation and choice of law suggests that answers aside from the *lex loci delicti* rule are applicable under New York law for a case of Tobacco's complexity, magnitude and public import. *See, e.g.,* Larry Kramer, *Choice of Law in Complex Litigation,* 71 N.Y.U. L.Rev. 547 (1996) (challenging the "consensus, at least, that ordinary choice-of-law practices should yield in suits consolidating large numbers of claims and that courts should apply a single law in such cases.").

This trend appears in European "private international law systems" of conflicts as well. Modern conflicts codifications abroad contain explicit escape clauses that authorize the court to deviate from certain and predictable rules when contingencies are present. *See generally* Symeon Symeonides *Private International Law At The End of the Twentieth Century* (1998); *see e.g.,* Jianfu Chen, *Australian Private International Law at the End of the 20th Century: Progress or Regress* (1998) (Australian courts have, through manipulation of classification techniques, chosen the most desirable law or result); Joseph Lookofsky, *Danish Private International Law at the End of the 20th Century: Progress or Regress* 147, 158–159 (1998) (reaching the same conclusion with regard to Scandinavian courts and attributing it to "Scandinavian Realism"). Codified private international systems are instructive because, while they have been adopted throughout Europe as mainstays of the traditional view on conflicts problems, they sanction the pursuit of material justice in the choice of law process. *See* Symeon Symeonides, *Reflections on American Conflicts of Law At The Dawn of the 21st Century,* 37 Willamette L.Rev. at 72 ("[A]s centuries of codification experience demonstrates, the

decision to adopt statutory rules need not result in outlawing judicial discretion. New codifications, more than old ones, are replete with examples of express legislative grants of judicial discretion."). For products liability conflicts in particular, the Swiss, the Italian, and Quebec codifications allow the plaintiff to choose from among the laws of: (a) the tortfeasor's place of business or habitual residence and (b) the place in which the product was acquired, subject to proviso. Id. at 66. The existence of these rules demonstrates that even codified conflicts law systems are capable of making adjustments when necessary. Friedrich K. Juenger, *Choice of Law and Multi-state Justice* 8–10 (1993) (the existence of so many result-oriented choice of law rules "contradicts the proposition that our discipline is value free"). Such flexibility and adjustments to choice of law are structurally and philosophically easier in uncodified systems like New York's.

More open approaches to jurisdiction also support more pliant parallel choice of law standards. *Cf.* "Article 14 Multiple Defendants," *Preliminary Draft on Jurisdiction and Foreign Judgments in Civil and Commercial Matters* (October 30, 1999) (dealing with jurisdiction, but having an indirect effect on choice of law; "A plaintiff bringing an action against a defendant in a court of the state in which that defendant is habitually a resident may also proceed in that court against other defendants not habitually resident in that state" under specified conditions designed to achieve an effective resolution of a complex dispute). *See also, e.g., In re DES Cases,* 789 F.Supp. 548 (E.D.N.Y.1992) (jurisdiction based on notions of fairness and due process rather than political boundaries in mass tort cases); *see generally* Harold L. Korn, *The Development of Judicial Jurisdiction in the United States: Part I,* 65 Brooklyn L.Rev. 935 (1999) (same).

Judicial preference for material justice in conflicts cases has grown the United States as courts have moved further from

vested rights thinking. *See* James A.R. Nafziger, *Making Choices of Law Together*, 37 Willamette L.Rev. 207, 209–210 (2000). In many single accident mass disasters, courts have been influenced by the new scholarship. *See, e.g., In re Air Crash Disaster Near Chicago, Ill. on May 25, 1979*, 644 F.2d 594, 616 (7th Cir.1981) (using "most significant relationship" test to justify application of Illinois law on punitive damages and smoothing over minor differences in various relevant state laws); *In re Disaster at Detroit Metro. Airport on August 16, 1987*, 750 F.Supp. 793, 795 (E.D.Mich.1989) (applying law of California to product liability claims and law of Michigan to all damage claims except those filed in California); *In re Air Crash Disaster at Stapleton Int'l Airport, Denver, Colo., on November 15, 1987*, 720 F.Supp. 1445, 1447 (D.Colo.1988) (finding that Texas had most significant relationship to punitive damage claims); *In re Paris Air Crash of March 3, 1974*, 399 F.Supp. 732, 749 (C.D.Cal.1975) (applying California law where there was no showing of greater or equal interest of foreign state to apply its own law); *see also* James A.R. Nafziger, *Choice of Law in Air Disaster Cases: Complex Litigation Rules and the Common Law, supra*, at 1015–84 (describing analysis and result in 62 cases decided between 1975 and 1993 which support use of single law in mass tort cases). This trend has especially developed in light of the Supreme Court's decision in *Sun Oil v. Wortman*, 486 U.S. 717, 108 S.Ct. 2117, 100 L.Ed.2d 743 (1988), which increased the flexibility of courts to interpret and possibly reconcile multiple state laws. 486 U.S. at 730–731, 108 S.Ct. 2117 ("To constitute a violation of the Full Faith and Credit Clause or the Due Process Clause, it is not enough that a state court misconstrue the law of another state. Our cases make plain that the misconstruction must contradict law of the other State that is *clearly established* and that has been brought to the court's attention ... We cannot conclude that any of the interpretations at issue here runs afoul of that standard.").

The pursuit of justice in these cases is not free of cost in its sacrifice of predictability and ease of application. New York law has recognized that appropriate constraints on the exercise of judicial discretion are useful in ordering cases. Nevertheless, the unique characteristics of the Tobacco case—the global fraud concerning the risks of highly mobile products, with huge, long term consequences for public health—presents a problem where "rules and principles of law cause impatience if too fixed in their application." Joseph H. Beale, 1 *A Treatise on the Conflict of Laws*, 50 (1935)

Under the rules of *Klaxon*, this court is bound to analyze issues consistently with New York conflicts of laws. It must predict how the New York Court of Appeals would view the matter. Because the New York Court of Appeals has never directly spoken to conflicts decisions in massive class actions, courts are left to assess trends in New York law, history, and current scholarship to reach a "just, fair, and logical result." While New York has fashioned some rules to lend uniformity to conflicts analysis in general, these rules do not contemplate a complex fact pattern such as this one. This area of the law in New York is still cooking. Under these circumstances, courts are required to return to the fundamental rule of New York, the *Babcock* interest analysis.

### B. Constitutional Limits

Relying on *Shutts*, defendants argue that New York must have a significant contact or significant aggregation of contacts to the claims asserted by "each member of the plaintiff class" to ensure that the choice of that state's law is not arbitrary or unfair. They assert that, even assuming that defendants did substantial business in the forum state and conducted a national fraud from the forum state, its courts may not apply forum law to individual claims of non-forum residents whose injuries were suffered in their home states.

*Shutts*, however, has not been read so narrowly.

The United States Supreme Court has never fully articulated the exact nature of the contacts that would be sufficient. Cases that have fleshed out the kinds of contacts sufficient to apply a single law are not dissimilar from the present one. *See, e.g., Gruber v. Price Waterhouse*, 117 F.R.D. 75, 82 (E.D.Pa.1987) (finding selection of forum law constitutional in securities litigation where defendant Price Waterhouse maintained its principle place of business in the forum and auditing and financial statement preparation occurred there); *In re ORFA Securities Litigation*, 654 F.Supp. 1449 (D.N.J.1987) (applying New Jersey law to the class where defendant's principle place of business was New Jersey and alleged misrepresentations originated there); *In re Activision Securities Litigation*, 621 F.Supp. 415, 430–31 (N.D.Cal.1985) (selecting California law to govern a class where Activision maintained its principle place of business in the state, issued securities in the state, and the purchasers' acceptances were directed at the state); *In re LILCO Securities Litigation*, 111 F.R.D. 663, 670 (E.D.N.Y.1986) ("Without doubt, *Shutts* does not require us to apply the law of each state in which the plaintiffs reside nor does it prohibit the application of one state's law to all plaintiffs, regardless of residence"); Alan M. Mansfield, *Nationwide Class Actions in State Court: Starting With Shutts*, 1172 Practicing Law Institute: Corporate Law and Practice Course Handbook Series 263, 270 (2000) ("[A] number of courts have cited Shutts for the questionable proposition that the laws of every state in which a class member resides must be considered in nationwide class actions for state law violations, without explanation of how Shutts supports such a proposition."); *but see In re Ford Motor Co. Bronco II Product Liability Litigation*, 177 F.R.D. 360, 369–71 (E.D.La.1997) (*Shutts* test was not satisfied by plaintiff's attempt to apply Michigan law to a nationwide class on the grounds that defendant Ford has its prin-ciple place of business in Michigan and design decisions were made there). A California appellate court has even held it reversible error to *fail* to consider the possibility of a single governing law on a motion for class certification. *See Clothesrigger Inc. v. GTE Corp.*, 191 Cal.App.3d 605, 236 Cal.Rptr. 605 (1987).

The significant contacts with New York state in this case satisfy Due Process and Full Faith and Credit under *Shutts*. The tobacco industry and present defendants' activities underlying the litigation have many connections to New York State. Philip Morris and Lorillard both have their principle places of business in New York City, and both of these companies have been headquartered in New York for several years. *See Simon v. Philip Morris, Inc.*, 86 F.Supp.2d 95, 107 (E.D.N.Y.2000).

Much of Tobacco's conduct took place in New York, particularly activities relating to the alleged conspiracy that led to plaintiff's damages. For example, the original 1953 meeting at which the major companies agreed to pursue a public relations program in reaction to a health scare took place at the Plaza Hotel in New York City. *See* Plaintiffs' Proffer at 19. H & K, the firm retained to develop the public relations program, is a New York corporation with its principle place of business in New York. *See Simon*, 86 F.Supp.2d at 107. One of H & K's initial recommendations to the industry was to establish a subcommittee of chief executives resident in New York. *See* Plaintiffs' Proffer at 21.

All six major tobacco companies joined together to form TIRC and later TI. CTR (formerly TIRC) and TI were both incorporated in New York. *See Simon*, 86 F.Supp.2d at 107. "CTR's offices in New York City generated critical data with which to dispute and deflect attention from the evidence linking smoking to lung cancer, heart disease and other illnesses." *Id.* These entities were allegedly at the center of the fraud.

The tobacco industry also had business and legal ties to New York. Some of BAT's

major investors have been based in New York, including Oppenheimer Capital Management, Chancellor Capital Management, and Manufacturers Hanover Trust. *See id.* at 100. Some industry lawyers were also based in New York. "JM & F, the law firm which ... played an important role in CTR 'special projects' is located in New York City." *Id.* at 107.

Finally, substantial amounts of cigarettes are sold in New York. For example, B & W has an 18% share of the American market. "While the percentage of these profits ultimately traceable to New York is unclear, B & W's strong market presence and the size of the New York population strongly support the inference of substantial New York cigarette sales roughly proportional to the percentage of New York residents in the total United States population—somewhere in the neighborhood of seven percent." *Id.* at 100. The same analysis can be applied to the other major tobacco companies. There is a significant aggregation of contacts sufficient to satisfy the Constitution

It is worth noting that *Shutts* itself was not a complex case. The potential application of four different state interest rates in *Shutts* was not likely to create the kind of joinder, pretrial, trial, or remedial complexity as the case at bar. *Shutts* still leaves open the possibility that the choice of a single law (or multiple state laws) is constitutionally permissible if the mechanical application of multiple laws threaten the rational adjudication that lies at the heart of due process, and "this threat outweighs the countervailing Due Process and Full Faith and Credit Clause considerations that animated *Shutts*." Jay Tidmarsh & Roger H. Transgrud, *Compex Litigation and the Adversary System* 804 (1998).

## C. Interest Analysis

### 1. New York's Conflict of Law Principles

■ A court is free to bypass the choice of law analysis and apply New York law in the absence of a material conflict. See *Curley v. AMR Corp.*, 153 F.3d 5, 12 (2d Cir.1998) ("It is only when it can be said that there is no actual conflict that New York will dispense with a choice of law analysis."); *Diehl v. Ogorewac*, 836 F.Supp. 88, 92 (E.D.N.Y.1993); *see also Barron v. Ford Motor Co. of Canada, Ltd.*, 965 F.2d 195, 197 (7th.Cir.1992) ("Before entangling itself in messy conflict of laws analysis a court ought to satisfy itself that there actually is a difference between the relevant laws of the different states"). A material conflict must have a significant possible effect on the outcome of the trial to bring into play choice of law rules. *In re Complaint of Bankers Trust Co.*, 752 F.2d 874 (3d. Cir.1984). Plaintiffs' core theory sounds in fraudulent concealment. Since Simon II is a nationwide class, the interests of all 50 states laws are implicated. Some of these laws conflict with New York's—though the degree of difference can be overstated. *Cf. In re Air Crash Disaster Near Chicago, Illinois on May 25, 1979*, 644 F.2d 594 (7th Cir.1981) (interpreting various state laws as essentially the same as that of forum state); Friedrich K. Juenger, *Mass Disasters and the Conflict of Laws*, 1989 U. Ill. L.Rev. 105, 123, 124 (1989).

■ State laws' elements of a claim for fraudulent concealment, while not uniform in all states, share many attributes. *See Restatement (Second) of Torts*, §§ 550, 551. A plaintiff must prove that: (1) the defendant had a duty to disclose; (2) the defendant suppressed material facts; (3) the suppression induced the plaintiff to act or to refrain from acting; and (4) the plaintiff suffered damages as a proximate result of the defendants conduct. *See In re Prudential Insurance Co. of America Sales Practices Litigation*, 148 F.3d 283, 315 (3rd Cir.1998) ("claims for fraud are substantially similar and any differences fall into a limited number of predictable patterns"); *In re Cordis*, 1992 WL 754061

at 14 ("Although there are differences in the standards which govern ... fraud, the similarities outweigh the differences.").

There are some variations. At least three alternative predicates create a duty to disclose: superior knowledge, partial disclosure, and fraudulent concealment. *See* California Jury Instructions (BAJI 12.36) (requiring duty to disclose); Georgia Pattern Jury Instructions (Chapter XIV, Sec. C) (same); Michigan Standard Jury Instructions § 128.02 (same); Wisconsin Jury Instructions § 2401 (same). Second, jurisdictions split over whether reliance is determined objectively or subjectively. Alaska, Michigan and Mississippi require that a plaintiff only prove that he or she relied on the misrepresentation. Georgia, Colorado, California, the District of Columbia, Illinois, Alabama and Maine also impose the more objective standard—justifiable reliance.

Given the possibility of some actual conflict between the New York law of fraudulent concealment and that of some other state versions of this cause of action, a conflicts determination is called for.

### 2. New York's Interests in the Instant Dispute

As already established, the parties' domiciles and the "locus of the tort" are usually the most significant contacts, for purposes of evaluating the relative strength of state interests in ordinary tort cases. See Part III A 1 & 2, *supra.* Plaintiffs are domiciled around the country, and have been allegedly harmed throughout the nation. Defendants are domiciled in New York, North Carolina, and Kentucky. The injuries resulting from tobacco smoking stretches over tens of years and concerns a highly portable product. Yet, arguably, the gravamen of defendants' misconduct occurred in New York. An analysis of New York interests needs to be set against interests of those other jurisdictions.

The three reasons most often urged in support of applying the law of the "locus of the tort" in cases such as the one before us

are: (1) to protect medical creditors who provided services to injured parties; (2) to prevent injured tort victims from becoming wards in the locus state; and (3) to deter future tortfeasors in the locus state. *Schultz,* 65 N.Y.2d 189, 200, 491 N.Y.S.2d 90, 480 N.E.2d 679. New York, along with the other states, shares an interest in these first two factors. As the evidence proffered by the plaintiffs illustrates, approximately 150,000 United States residents die each year from lung cancer, and established medical science concludes that where primary lung cancer is found in a person who has at least a twenty year history of smoking conventional cigarette products, smoking was a substantial contributing factor. This widespread crises has placed a substantial burden on all 50 states' coffers and medical services (which tend more and more to be national in scope). All share an interest in determining how to compensate and protect their respective domiciliaries.

With regard to deterrence, New York has an obvious and substantial interest in ensuring that it does not become either a base or a haven for law breakers to wreak injury nationwide. *See, e.g., Bergeron,* 100 F.Supp.2d at 170 (2000). As detailed in plaintiffs' complaints and supporting documents, substantial portions of Tobacco's alleged conspiracy were orchestrated in New York. *See, e.g., Simon v. Philip Morris, Inc.,* 86 F.Supp.2d 95, 107 (E.D.N.Y. 2000). CTR, which was a major vehicle for perpetuating the conspiracy, operated in New York. A number of critical meetings of Tobacco representatives necessary to orchestrate the scheme allegedly occurred in New York, and at least two of the companies, Lorillard and Philip Morris, Inc., have their principle places of business in New York.

Each plaintiff's state of residence may also have a regulatory interest in compensatory damages. *See, e.g., In re Agent Orange Product Liability Litigation,* 580 F.Supp. 690, 705 (E.D.N.Y.1984). States

that disallow or limit compensatory damages, just as those that disallow punitive damages, are more interested in controlling excessive liability (or loss allocation) than in punishing and deterring conduct. *Cf. Schultz*, 65 N.Y.2d 189, 200, 491 N.Y.S.2d 90, 480 N.E.2d 679 (finding locus of tortious conduct less important because rule in conflict was loss allocating, rather than conduct-regulating). In complex tort litigation, jurisdictions with the strongest nexus to the offending conduct have the greatest interests in punishment and deterrence. *See ALI Complex Litigation: Statutory Recommendations and Analysis* (choice of law) § 6.06, comment a. (general rationale).

New York's interest appears more significant in this action than that of any single other state. It has a greater interest in determining *general* compensatory liability issues since, like punitive damages, they may bear directly on the regulation of dangerous conduct within its borders. *Cf. Russell J. Weintraub, Methods For Resolving Conflicts of law Problems in Mass Tort Litigation*, 1989 U.Ill.L.Rev. 129 (1989) ("higher compensatory damages may also punish and deter"); *see, e.g., American Law Institute: Complex Litigation: Statutory Recommendations and Analysis* (choice of Law) § 6.01, comment a ("state where the defendant acted clearly may have a legitimate interest in regulating that conduct and in controlling defendant's potential tort liability"); see, *e.g., Pescatore*, 97 F.3d at 14 ("New York has an obvious interest in regulating the extent to which New York-corporations may be held liable for excessive or punitive damages").

That a state limits damages—as in the case suggested by defendants of Texas—does not deny New York's authority to sensibly apply its own law to protect those it has a policy to safeguard. This is illustrated by the leading case of *Hurtado v. Superior Court of Sacramento County*, 11 Cal.3d 574, 114 Cal.Rptr. 106, 522 P.2d 666 (1974). The court held that in a California

action for wrongful death of a Mexican citizen based upon an automobile accident in California, the court should not apply Mexican limits on recovery. The court declared:

> The interest of a state in a tort rule limiting damages for wrongful death is to protect defendants from excessive financial burdens on exaggerated claims ... Mexico has no defendant residents to protect and has no interest in denying full recovery to its residents injured by non-Mexican defendants.

11 Cal.3d at 580–81, 114 Cal.Rptr. 106, 522 P.2d 666. *Cf. Labree v. Major*, 111 R.I. 657, 662, 673, 306 A.2d 808, 812 (1973) (after a comprehensive analysis of the New York cases, applying an interest analysis favoring the plaintiff, "no matter what the place of his residence or the place of the accident"). The *Hurtado* court went on to point out that California's interest was "to deter conduct" in California. *Id.* at 583, 114 Cal.Rptr. 106, 522 P.2d 666; *see also Abogados v. AT & T, Inc.*, 223 F.3d 932, 935 (9th Cir.2000) (confirming *Hurtado's* proposition that damage limitation rules are intended to protect defendants from large verdicts).

The recent Fifth Circuit decision in *Spence v. Glock*, 227 F.3d 308 (5th Cir. 2000), is not inconsistent with the conclusion reached in this memorandum on the applicability of New York law to elements of the plaintiffs cause of action. *Glock* was a case brought in Texas based upon a design defect in Glock handguns causing them to jam. *Id.* at 310 n. 1. The guns were designed, and their parts manufactured, in Austria. *Id.* The parts were shipped to a subsidiary which assembled and serviced them in Georgia, and in turn sent them to distributors all over the United States where they were then sold to residents of the various states. *Id.* The district court certified a national class, ruling that Georgia law would be applied under the Texas conflict rules. *Id.* The court of appeals for the Fifth Circuit, relying on the Texas adopted ALI Restate-

ment (Second) Conflict of Laws, found that Georgia did not have the "most significant relationship" to the dispute in view of the Austrian connection. *Id.* at 312. It ruled that the law of the states of residence of the gun owners controlled, negating predominance; accordingly, it decertified the class. *Id.* at 315. The court of appeals did not discuss the interests of Austrian law in providing the controlling liability law on design defects. Applying Austrian law, rather than that of Georgia, could have obviated the court of appeal's objection to a single governing product design tort law. One may speculate on what the result would have been had the forum been Georgia and personal jurisdiction over both Glock Austria and its sister corporation in Georgia had been obtained; the practicalities of this kind of class may have been given greater weight. *See, e.g.,* discussion of *Carlenstolpe* at Part III A 2 ii, *supra.*

It is also significant that the *Glock* opinion seemed to leave open the question of what law should control the fraud claim, the basis of the claim in the instant case. *Id.* ("The argument that Georgia is the locus of the conduct causing the injury is more plausible with regard to plaintiff's fraud-related claims.")

In *Glock,* it seems apparent that the damage suffered by each member of the class in owning a somewhat defective gun was relatively small and decertification sounded the case's death knell so far as most owners were concerned. The *Glock* case could have been remanded to consider whether sub-classing by limited categories of state law, or certification on the basis of Austrian law. *See id.* at 313 ("Nor did the plaintiffs provide the court with a sub-class plan in case the court disagreed that Georgia law controlled."); *see also* Part III D *infra.* Holding that the district court had failed to "compare Georgia's contacts and the state policies those contacts implicate with those of the 50 other interested jurisdictions," it instead decertified the class. *Glock,* 227 F.3d at 312. Perhaps, under

the early appeal provision of Rule 23(f) of the Federal Rules of Civil Procedure more guidance to the trial court, rather than a rigid alternative of approval or disapproval of certification will become the mode. The case does provide a warning to trial courts that, when in doubt, alternative certification theories should be presented.

In this action, state interests of states other than New York will be less implicated in any conflict since the court envisions transferring individual compensatory questions to each plaintiff's home district. Through the use of depecage (Part III C 3, *infra* ), each claimant will rely upon his or her own state law with regard to critical individual recovery issues.

Moreover, the interests of other states in substituting their law of liability for New York's are limited. The Attorneys General have already jointly obtained compensation for each of their states, thus diluting each states' disparate interest in the tobacco litigation. *See* National Association of the Attorneys General, "Master Settlement Text," *Multistate Settlement With The Tobacco Industry* (visited Nov. 13, 2000) <http://www.tobacco.neu.edu/Extra/multistate_settlement.htm>.

Determining general questions of liability under New York law dovetails well with a policy ensuring that New York can enforce its own set of civil obligations amongst its own domiciliaries and serve as an effective forum for determining injuries for its own (and others') citizens, who, without a centralized trial, may be left without an effective remedy. Note, *Mass Tort Jurisdiction and Choice of Law in a Mutlinational World Communicating by Extraterrestrial Satellites,* 37 Willamette L.Rev. 145, 153–154 (2000). The policies undergirding Rule 23—in providing an effective remedy for the injured—add one more justification for certifying a class under a single New York fraudulent concealment claim. *See, e.g., In re Seagate Technologies Securities Litigation,* 115 F.R.D. 264, 271 (N.D.Ca.1987) (foreign states interest in maintenance of Rule 23 class

action may outweigh interest in the application in the law to its own residents). *See also, e.g.,* Lesley Frieder Wolf, *Evading Friendly Fire: Achieving Class Certification After The Civil Rights Act of 1991,* 100 Colum. L.Rev. 1847 (2000) (effectively carrying out public substantive rights policy requires an effective class action regime).

Defendants assert that the suggestion that "the state where injured parties reside have an interest in applying some entirely unrelated state's law" effectively turns interest analysis on its head. They point particularly to Texas and Alabama which have already, defendants contend, barred the claims brought here. This concern is largely negated, however, because Texas and Alabama statutes would still foreclose claims under the split-certification-trial plan contemplated by the court.

More generally, a state's policy interest in allowing application of similar rules of law and redress for its citizens in another forum may outweigh an interest in strict application of its own law—particularly if the result is a lack of an effective remedy for its residents. *See, e.g., Platano v. Norm's Castle, Inc.,* 830 F.Supp. 796 (S.D.N.Y.1993) (applying New York Dramshop act to action arising from Connecticut accident caused by driver who became intoxicated in New York tavern, but awarding compensatory damages under Connecticut's more generous standards so as to better effectuate the deterrence policy in New York); Arthur T. von Mehren, *Special Substantive Rules for Multistate Problems: Their Role and Significance in Contemporary Choice of Law Methodology,* 88 Harv. L.Rev. 347, 367–369 (1974) (proposing conflicts be resolved more expediently through compromise of competing policies); Aaron D. Twerski & Renee G. Mayer, *Toward a Pragmatic Solution of Choice of Law Problems—At the Interface of Substance and Procedure,* 74 Nw. U.L.Rev. 781, 793, 797, 799 (1979) (proposing that a guest statute conflict be resolved by allowing the suit, but raising the standard of proof so that the guest plaintiff can recovery only if he proves ordinary negligence by clear and convincing evidence); Stanley E. Cox, *Substantive, Multilateral, and Unilateral Choice of Law Approaches,* 37 Willamette L.Rev. 171, 179 (2000) (suggesting these flexible approaches work best in "mass disaster and consolidated or class litigation situations").

States can have a broader concern with the protection of the welfare of their own citizens than in the strict application of their own law. The differences between states are unlike the differences between nations. People and goods move across state lines in the United States with ease and rapidity. It is understandable that each state will be sympathetic to the needs of out-of-state residents, particularly when those needs are intertwined with those of its own citizens. Choice of law decisions are made in part based on the interrelated "interstate judicial system's interest in obtaining the most efficient resolution of controversies." *World Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

### 3. Depecage

 Depecage doctrine recognizes that in a single action different states may have different degrees of interests with respect to different operative facts and elements of a claim or defense. *See Babcock,* 12 N.Y.2d at 484, 240 N.Y.S.2d 743, 191 N.E.2d 279 ("there is no reason why all issues arising out of a tort claim must be resolved by the same jurisdiction"). Under depecage, different substantive issues in a tort case may be resolved under the laws of different states where the choices influencing decisions differ. *LaPlante v. American Honda Motor Co., Inc.,* 27 F.3d 731, 741 (1st Cir.1994). It permits severance of statutes of limitations, questions of individual causation, damages, and affirmative defenses in accordance with different states' law. *See, e.g., Babcock,* 12 N.Y.2d at 485, 240 N.Y.S.2d 743, 191 N.E.2d 279 ("Where the

issue involves standards of conduct, it is more than likely that it is the law of the place of the tort which will be controlling but the disposition of other issues must turn, as does the issue of conduct itself, on the law of the jurisdiction which has the strongest interest in the resolution of the particular issue presented"); *Schultz*, 65 N.Y.2d at 195, 491 N.Y.S.2d 90, 480 N.E.2d 679 ("relative interest of ... jurisdictions in having their laws apply will depend on the *particular tort issue* in conflict of the case") (emphasis added); *Plante v. American Honda Motor Co., Inc.*, 27 F.3d at 741 (doctrine of depecage could apply one law to measure of compensatory damages and another to substantive rules of liability); Stanley E. Cox, *Substantive, Multilateral and Unilateral Choice of law Approaches, supra* at 179 ("[A] court may apply depecage to the case, using many jurisdictions' laws to resolve many different pieces of the case."); *but see Morgan Guaranty Trust Company of New York v. Republic of Palau*, 693 F.Supp. 1479, 1495 (S.D.N.Y. 1988) (depecage is not available for applying different laws to a cause of action and affirmative defenses).

■ Applying the rules of different states to determine different issues in the same action is appropriate in the instant case. *See* Willis M. Reese, *Depecage: A Common Phenomenon In Choice of Law*, 73 Colum.L.Rev. 58 (1972). Its application "(a) would result in the application to each issue of the rule of the state with the greatest concern in the determination of that issue, (b) would serve to effectuate the purpose of each of the rules applied, and (c) would not disappoint the expectations of the parties." Id. at 60. When depecage is relied upon, New York courts utilize its paramount interest test to decide which law to apply to each of the issues. *Hutner v. Greene*, 734 F.2d 896 (2d Cir.1984).

Depecage results in the resolution of "the issue [according] to the rule of the state with the greatest concern." Reese, *Depecage: A Common Phenomenon In Choice of Law*, at 58; *but see* Christian L.

Wilde, *Depecage in the Choice of Tort Law*, 41 So. Calif. L.Rev. 329 (1968) (dangers in applying the doctrine). While New York has a paramount interest in punishing and deterring misconduct in New York, other states have a concurrent interest in ensuring that their own citizens receive individual relief in line with their own compensatory schemes.

Applying depecage "effectuates the purposes" of conflicting rules. Reese, *Depecage: A Common Phenomenon In Choice of Law*, at 58. States, like Texas and Alabama, which have, it is said, barred these types of actions have an interest in controlling excessive liability. The loss allocation purposes of these rules may be furthered by applying these respective state law rules, such as statutes of limitations, as defenses to individual actions in transferee courts. Such an approach is also in line with the nature of New York's borrowing requirement for statutes of limitation. *See* N.Y. C.P.L.R. § 202 (McKinney 1994); *see also Global Financial Corp. v. Triarc Corporation*, 93 N.Y.2d 525, 693 N.Y.S.2d 479, 715 N.E.2d 482 (1999) (applying statute of limitation of state where action accrued because choice of law analysis is "inapplicable to the question of statutory construction presented by C.P.L.R. § 202").

Finally, applying depecage will not disappoint the expectations of the parties. Differential treatment is not arbitrary, but the result of our federal system, which still generally defers to state tort law in deciding parties' rights. *See* Russell J. Weintraub, *Methods For Resolving Conflict of Laws Problems in Mass Tort Litigation, supra* ("It may well be that the state X limits on recovery are anachronistic, cruel, or any other pejorative that may leap to an outraged mind; however, that is the business of state X's residents and the X legislature."); *but see* Reese, *The Law Governing Airplane Accidents*, 39 Wash & Lee. L.Rev. 1303, 1306–7 (1982); *cf. In re Paris Air Crash*, 399 F.Supp. 732 (C.D.Cal. 1975) (the law of the place of manufacture,

not that of the victims' residences, determines the measure of damages in a suit against airplane manufacturers).

### D. Manageability

 Should the court of appeals for the Second Circuit reject the application of New York law in the way sketched in this memorandum, it could remand to determine the manageability of state subclasses or other techniques to accommodate the variations that do exist among state laws. *See, e.g., In re Telectronics Pacing Sys., Inc.,* 172 F.R.D. 271, 291–92 (S.D.Ohio 1997) (describing options court faces in conflict of laws' class action determination to "(1)find that state law is sufficiently similar that a single class is appropriate; (2) find that the state law varies so much that class certification is inappropriate; or (3) find that state law variations can be categorized and then divided into subclasses"). Use of subclasses to make class actions more manageable is fair and routine. *Alexander v. Centrafarm Group,* 124 F.R.D. 178, 186 (N.D.Ill.1988) (predicting that lack of variation among state fraud laws would produce few individual questions and providing for individualized hearings or alteration of class certification); *In re Computer Memories Sec. Litig.,* 111 F.R.D. 675, 686 & n. 7 (N.D.Cal.1986) (either California law would apply "across the board" or subclasses would be employed; otherwise, class could be decertified or modifications could be made in structure of litigation); *In re LILCO Sec. Litig.,* 111 F.R.D. 663, 670 (E.D.N.Y.1986) (doubting that differences in state laws were "so great as to preclude class treatment" and providing for the use of subclasses if necessary); *see, e.g., Maywalt v. Parker & Parsley Petroleum Co.,* 147 F.R.D. 51, 58 (S.D.N.Y.1993) (discounting defendants' "speculative forecast of difficulties" with making choice-of-law determination and certifying provisionally on ground that subclasses can be created). Plaintiff's "appendix 'H'" to its brief demonstrates the relative uniformity among the states' fraudulent concealment laws; material dif-

ferences are few. *See, e.g.,* Larry Kramer, *Choice of Law in Complex Litigation,* 71 N.Y.U. L.Rev. 547, 583 (1996) ("[T]here will never be 50 different substantive rules, or even fifteen or ten. States tend to copy their laws from each other, and many use identical or virtually identical rules. In practice, the court will seldom have to deal with more than three or four formulations").

### E. Summation

Defendants and their experts on tort and conflicts law have properly emphasized the many nuances, both substantively and procedurally, in law from state to state. The court, however, cannot ignore two fundamentals: 1) it is dealing with human institutions that, unlike the exquisite machinery of atomic physicists with tolerances approaching zero, must interpret the law reasonably, with some play in its joints if it is to effectively serve its protective role, and 2) it is responding to a complex nationwide fraud allegedly created by defendants; the contention of the defendants that the plaintiff's claims are too widespread to be dealt with effectively by the courts must be considered in light of the allegations that it is defendants' pervasive fraud that has led to the need for nationally applicable remedies. The basic premise of law in this country remains that for every wrong there is a remedy, an effective and realistic remedy.

Defendants assert that the fact that this is a nationwide class action cannot justify altering or modifying otherwise applicable choice of law rules. Choice of law is primarily a substantive matter, a decision that determines the nature and specific contours of a party's rights. The class action is also an outgrowth of history and equity, that changes the real power and substantive balance of rights of those whose claims are aggregated. Both the drafters and critics of Rule 23 perceive this, and it accounts for the political content that underlies some of the attacks on,

and defenses of, class actions. *See generally* Lesley Frieder Wolf, *Evading Friendly Fire: Achieving Class Certification After The Civil Rights Act of 1991,* 100 Colum. L.Rev. 1847 (2000) (federal courts can, and should, comply with the certification rules and the Constitution in carrying out national policy); Judith Resnick, *From Cases to Litigation* 66–67 (May 1990) (contrast between substantial controversy that greeted 1966 revisions of class action rule and absence of objections to consolidation pursuant to Multidistrict Litigation Act); Robert L Carter, *The Federal Rules of Civil Procedure as a Vindicator of Civil Rights,* 137 U.Pa.L.Rev. 2179, 2184–2190 (1989). Although the New York Court of Appeals has never directly decided conflicts policy in massive class actions, trends in New York law, history, and current scholarship involving mass torts suggest that a "just, fair, and logical result" under *Babcock* should respect and balance these equitable rights and considerations.

Interpreting applicable law in light of precedent and need, it appears, preliminarily and tentatively, that it is the unitary and substantive law of New York and the unitary federal procedure that will govern much of Simon II. If, on appeal from orders certifying the class, the court of appeals of this circuit or the New York Court of Appeals should disagree with the district court's interpretation of New York's conflict of laws policy suggested in this memorandum, then certification based upon similarity of state substantive law and its classification into a relatively few types would permit certification on that basis. A remand for reconsideration of the certification issue would then be appropriate in the conversation between the trial and appellate courts encouraged by Rule 23(f) of the Federal Rules of Civil Procedure. *See National Asbestos Workers Medical Fund v. Philip Morris,* 71 F.Supp.2d 139, 160 (E.D.N.Y.1999).

## IV. CONCLUSION

The parties and magistrate judge should attempt to prepare *Simon II* for trial as soon as practicable. Motions for and against class certification, if they are to be made, should be made promptly. Tobacco cases with set trial dates (*see* Part II B, C and F) shall proceed to trial as scheduled. Application for trials in other cases will be entertained.

SO ORDERED.